2013-1679, 2014-1692

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

WORLD CLASS TECHNOLOGY CORPORATION,

*Plaintiff-Appellee*,

v.

ORMCO CORPORATION,

*Defendant-Appellant.*

**Appeal from the United States District Court for the District of Oregon
in Case No. 3:13-CV-00401-AC, Magistrate Judge John V. Acosta**

**BRIEF FOR ORMCO CORPORATION**

Gregory F. Ahrens
WOOD, HERRON & EVANS, L.L.P.
441 Vine Street
2700 Carew Tower
Cincinnati, OH 45202

February 12, 2014

Patrick J. Coyne
FINNEGAN, HENDERSON,
 FARABOW, GARRETT &
 DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001
(202) 408-4000

*Attorneys for Defendant-
Appellant,
Ormco Corporation*

# CERTIFICATE OF INTEREST

Counsel for Appellant, Ormco Corporation, certify the following:

1. The full name of every party or amicus represented by us is:

    Ormco Corporation.

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by us is:

    N/A.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:

    Danaher Corporation, a publicly traded company, is the parent company of Ormco Corporation. No other publicly held corporation owns 10 percent or more of Ormco Corporation's stock.

4. The names of all law firms and the partners and associates that appeared for the party in the lower tribunal or are expected to appear for the party in this Court are:

    WOOD HERRON & EVANS, L.L.P.
    Gregory F. Ahrens, Paul J. Linden

    LONDON & MEAD
    Christopher B. Mead

    FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP
    Patrick J. Coyne

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................ i

STATEMENT OF RELATED CASES .................................................. ix

I.     JURISDICTIONAL STATEMENT ...............................................1

II.    STATEMENT OF THE ISSUES ..................................................2

III.   STATEMENT OF THE CASE .....................................................3

      A.    Preliminary Statement ......................................................3

      B.    Overview of the Technology .............................................5

      C.    Background ........................................................................8

      D.    The Oda '896 Patent .......................................................11

            1.    The "Support Surface" and "Ledge" Are Disclosed Broadly and Are Not Constrained by the Additional Functional Limitations Identified by the Magistrate Judge ......12

            2.    Nothing in the Specification Requires the "Support Surface" to Support and Guide the Slide During Its Movement from the Open to the Closed Position and the Ledge to Contact the Slide Only in the Closed Position ..........15

      E.    The Claims on Appeal ......................................................24

            1.    Claims 1, 2, 5, and 7 Are Not Limited in the Manner Construed by the Magistrate Judge ...........................................24

            2.    The Non-Asserted Claims Inform the Construction of the Asserted Claims .......................................................26

      F.    The Accused WCT Brackets ............................................27

      G.    Course of the Proceedings ................................................29

      H.    The Magistrate Judge's Claim-Construction Ruling .........................................30

1.    The Magistrate Judge Improperly Imported Limitations from the Specification into the Claims .....................................30

2.    The Magistrate Judge Erred in His Analysis of the Claims ......................................................................................31

3.    The Magistrate Judge's Erroneous Claim Construction Is Critical to All Issues on This Appeal.......................................36

IV.    SUMMARY OF THE ARGUMENT ...........................................37

V.    ARGUMENT.................................................................................40

A.    The Magistrate Judge's Claim Construction Is Reviewed *De Novo*.....................................................................................40

B.    The Legal Principles Governing Claim Construction Are Not Disputed................................................................................40

C.    The Magistrate Judge Erroneously Construed the Claims.................43

1.    The Magistrate Judge Improperly Rejected the Authority Identified by Ormco that Limitations Cannot Be Read from the Specification into the Claims .....................................44

2.    The Magistrate Judge Erred in Crediting WCT's Arguments that Ormco Acted as Its Own Lexicographer Where Ormco Gave No Special Meaning to the Terms Other Than Their Common, Ordinary Meaning.......................45

3.    The Magistrate Judge Erred by Importing Limitations from the Specification into the Claims .....................................50

4.    The Other Claims Inform the Meaning of the Terms "Support Surface" and "Ledge," Compelling that They Be Given Their Common, Ordinary Meanings ........................56

5.    Ormco Has Done Nothing to Disclaim or Disavow the Broad Meaning of the Terms "Support Surface" and "Ledge," Further Compelling that They Be Given Their Common, Ordinary Meanings .................................................57

6.    The Magistrate Judge Erred by Allowing His Incorrect
      Construction of "Support Surface" to Determine the
      Construction of "Ledge" ...........................................................59

VI.   CONCLUSION................................................................................59

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abbott Labs. v. Sandoz, Inc.*,
   566 F.3d 1282 (Fed. Cir. 2009) ...........................................33, 44, 57

*Acumed LLC v. Stryker Corp.*,
   483 F.3d 800 (Fed. Cir. 2007) .....................................................*passim*

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*,
   512 F.3d 1338 (Fed. Cir. 2008) ..............................................................31

*Bell Atlantic Network Serv., Inc. v. Covad Communications Group, Inc.*,
   262 F.3d 1258 (Fed. Cir. 2001) ..............................................................45

*Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*,
   334 F.3d 1294 (Fed. Cir. 2003) ..............................................................46

*Callicrate v. Wadsworth Manufacturing, Inc.*,
   427 F.3d 1361 (Fed. Cir. 2005) .........................................................52, 53

*Cohesive Techs., Inc. v. Waters Corp.*,
   543 F.3d 1351 (Fed. Cir. 2008) ..............................................................57

*Comark Commc'ns, Inc. v. Harris Corp.*,
   156 F.3d 1182 (Fed. Cir. 1998) ........................................................34, 44, 50

*Deere & Co. v. Bush Hog, LLC*,
   703 F.3d 1349 (Fed. Cir. 2012) ........................................................33, 43, 44

*E-Pass Technologies, Inc. v. 3Com Corp.*,
   343 F.3d 1364 (Fed. Cir. 2003) .........................................................46, 47

*Ecolab Inc. v. Paraclipse, Inc.*,
   285 F.3d 1362 (Fed. Cir. 2002) ..............................................................50

*Eolas Techs. Inc. v. Microsoft Corp.*,
   399 F.3d 1325 (Fed. Cir. 2005) ..............................................................53

*Epistar Corp. v. Int'l Trade Comm'n,*
   566 F.3d 1321 (Fed. Cir. 2009) .......................................................41

*Exergen Corp. v. Wal-Mart Stores, Inc.,*
   575 F.3d 1312 (Fed. Cir. 2009) .......................................................32

*Free Motion Fitness, Inc. v. Cybex Int'l, Inc.,*
   423 F.3d 1343 (Fed. Cir. 2005) ..................................................31, 57

*Gillette Co. v. Energizer Holdings, Inc.,*
   405 F.3d 1367 (Fed. Cir. 2005) .......................................................32

*Golight Inc. v. Wal-Mart Stores, Inc.,*
   355 F.3d 1327 (Fed. Cir. 2004) .......................................................47

*Invitrogen Corp. v. Biocrest Mfg., L.P.,*
   327 F.3d 1364 (Fed. Cir. 2003) .......................................................32

*Lampi Corp. v. Am. Power Prods., Inc.,*
   228 F.3d 1365 (Fed. Cir. 2000) ..................................................34, 44

*Laryngeal Mask Co. Ltd. v. Ambu,*
   618 F.3d 1367 (Fed. Cir. 2010) .......................................................46

*Liebel-Flarsheim Co. v. Medrad, Inc.,*
   358 F.3d 898 (Fed. Cir. 2004) ...............................................48, 50, 57

*MagSil Corp. v. Hitachi Global Storage Technologies, Inc.,*
   687 F.3d 1377 (Fed. Cir. 2012) .......................................................32

*McCarty v. Lehigh Valley R.R. Co.,*
   160 U.S. 110 (1895)................................................................*passim*

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.,*
   521 F.3d 1351 (Fed. Cir. 2008) .......................................................41

*Omega Eng'g, Inc. v. Raytek Corp.,*
   334 F.3d 1314 (Fed. Cir. 2003) ..............................................39, 42, 58

*Paragon Solutions, LLC v. Timex Corp.,*
   566 F.3d 1075 (Fed. Cir. 2009) .......................................................57

*In re Paulsen*,
    30 F.3d 1475 (Fed. Cir. 1994) ....................................................42, 45

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc) ...................................*passim*

*Retractable Techs., Inc. v. Becton, Dickinson & Co.*,
    653 F.3d 1296 1305 (Fed. Cir. 2011) ...............................32, 53, 54, 55

*Sentry Prot. Prods., Inc. v. Eagle Mfg. Co.*,
    400 F.3d 910 (Fed. Cir. 2005) ................................................................40

*Silicon Graphics, Inc. v. ATI Techs., Inc.*,
    607 F.3d 784 (Fed. Cir. 2010) .........................................................33, 43, 44

*SRI Int'l v. Matsushita Elec. Corp. of Am.*,
    775 F.2d 1107 (Fed. Cir. 1985) ..............................................................47

*SunRace Roots Enter. Co. v. SRAM Corp.*,
    336 F.3d 1298 (Fed. Cir. 2003) ..............................................................50

*Tandon Corp. v. U.S. Int'l Trade Comm'n*,
    831 F.2d 1017 (Fed. Cir. 1987) ..............................................................50

*Teleflex Inc. v. Ficosa N.A. Corp.*,
    299 F.3d 1313 (Fed. Cir. 2002) ...............................................*passim*

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
    723 F.3d 1363 (Fed. Cir. 2013) ..............................................................42

*Thorner v. Sony Computer Entm't Am., LLC*,
    669 F.3d 1362 (Fed. Cir. 2012) ..............................................................42

*Uship Intellectual Props., LLC v. United States*,
    714 F.3d 1311 (Fed. Cir. 2013) ..............................................................41

*Vitronics Corp. v. Conceptronics, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ............................................34, 40, 42

*Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*,
    200 F.3d 795 (Fed. Cir. 1999) ................................................................40

*Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*,
  239 F.3d 1225 (Fed. Cir. 2001) ..........................................................................50

**Statutes**

28 U.S.C. § 1295 ..........................................................................................1

28 U.S.C. § 1331 ..........................................................................................1

28 U.S.C. § 1338 ..........................................................................................1

## STATEMENT OF RELATED CASES

No other appeal in or from this action was previously before this or any

other appellate court.

# I.   JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331, and 1338. The district court denied Ormco Corporation's motion for a preliminary injunction on August 9, 2013. Ormco's Notice of Appeal was timely filed on September 9, 2013. Based on the district court's claim construction Opinion and Order, the district court entered a Stipulated Final Judgment of noninfringement on November 12, 2013. Ormco's Second Notice of Appeal was timely filed on December 12, 2013. This Court has consolidated both appeals. This Court has jurisdiction under 28 U.S.C. §§ 1295 and 1338.

## II.   STATEMENT OF THE ISSUES

The claims define the scope of a patented invention. The claims of Oda, U.S. Patent No. 8,393,896 ("the '896 patent"), are broader than the preferred embodiments depicted in the patent drawings. Although the patent drawings do not specifically depict this broader construction of "support surface" and "ledge," both are supported by the text of the application as originally filed, including the original claims. The Applicant gave the terms no unique definition and did not disclaim the common, ordinary definition of these terms in the specification or during prosecution.

A.   Did the district court err in construing the term "support surface" to be limited to "a surface on the bracket body that defines a slide engagement track and therefore supports and guides the claimed movable member during movement between open and closed positions," which are elements of preferred embodiments of the invention disclosed in the specification and not recited in the claims?

B.   Did the district court err in construing the term "ledge" to be "an area on the bracket body which contacts the claimed movable member only when the movable member is in the closed position," which are also elements of preferred embodiments disclosed in the specification and not recited in the claims?

## III.  STATEMENT OF THE CASE

### A.  Preliminary Statement

The principal issue in this case is the meaning of "support surface." In construing the claims of the '896 patent, the Magistrate Judge focused on what he perceived to be a single point of novelty of the invention. He limited "support surface" and "ledge" to specific details of preferred embodiments of the invention.

The Magistrate Judge's error is compounded by further errors in his analysis. First, the Magistrate Judge failed to appreciate that the use of the article "the" in conjunction with "support surface" is merely a reference to the *same* support surface recited previously in the same claim. The use of the article "the" does not limit the claim to one and only one "support surface." A35.

Second, the Magistrate Judge failed to appreciate that the transitional term used in the asserted claims—"comprising"—is open-ended and permits the claimed subject matter to include additional elements, including additional support surfaces.

Essentially, the Magistrate Judge erred by improperly importing into the claims limitations from the specification. The Magistrate Judge equated the "support surface" 46 with the "slide engagement track" 56 and the "translation plane" 60 based on preferred embodiments of the invention. Appellant concedes that certain preferred embodiments shown in the patent drawings are limited in this

manner. So too are the narrower claims—but by express limitations in these narrower claims and not by the proper construction of "support surface" and "ledge." Asserted claims 1, 2, 5, and 7,[1] however, lack these additional limitations.

The "support surface" 46 and "ledge" 90 are depicted in the patent drawings in a specific orientation relative to the tooth. Some of these additional limitations are also expressed in narrower claims. They are not, however, in the broader asserted claims. Rather, the asserted claims expressly recite "first" and "second" portions of the movable member and that the "support surface" and "ledge" are merely on opposite sides of the archwire slot, to make clear that the orientation and relative position of these elements are not limited. Nor are they limited to a particular direction of insertion of the slide into the bracket. A65, 4:30-40.

Nonetheless, the Magistrate Judge, misconstruing the article "the" as limiting, disregarding that the claims are open-ended, and relying heavily on preferred embodiments, limited "support surface" and "ledge" to the specific configurations and functions of the preferred embodiments.

Based on this construction, the Magistrate Judge found that the asserted claims are not infringed and denied Ormco preliminary injunctive relief. A26-47. The Magistrate Judge maintained this claim construction in his subsequent

---

[1] Ormco also asserted claims 10, 14, and 15. However, only claims 1, 2, 5, and 7 were asserted on the preliminary injunction motion.

*Markman* decision, A6-25, and the parties submitted a Stipulated Final Judgment based on the Magistrate Judge's erroneous claim construction, A1-5. Ormco urges this Court to reject the Magistrate Judge's erroneous claim construction and remand the case to the district court for further proceedings consistent with a proper construction of the claims.

### B. Overview of the Technology

Orthodontists have a specific frame of reference for directions in the mouth. "Gingival" refers to the gums. "Occlusal" refers to the surfaces of the teeth that abut when the teeth are brought together. The "gingival-occlusal" surface, therefore, is the surface of a tooth that is visible when someone is smiling with their teeth together. Assuming the bracket shown below is mounted on a bottom right molar (from the patient's perspective), the directions are as noted.



A60-61, *See also* A65, 4:34-40. The teeth have two gingival-occlusal surfaces, one on the lip- and cheek-side, and one on the tongue-side. The surface on the outside, toward the cheeks and lips, is the "labial" surface. The surface on the inside, adjacent the tongue, is the "lingual" surface.

The side-to-side directions are the "mesial" and "distal" directions. The "mesial" direction is toward the rear of the mouth. The "distal" direction is toward the front of the mouth. A65, 4:34-40. The direction laterally across the front surface of a tooth from side-to-side, therefore, is the "mesial-distal" direction.

Orthodontic brackets are used to straighten misaligned teeth. The brackets have a body that includes a horizontal slot, called an "archwire slot." In conventional orthodontic treatments, an orthodontist glues or cements brackets to

the patient's teeth. An "archwire" is fitted into the archwire slot in each bracket.

The archwire is held by the brackets and, as it is progressively tightened or

otherwise adjusted during the course of treatment, it forces the teeth into the

desired positions. A77.



A104. In conventional orthodontic appliances, the archwire is often rectangular in

cross-section. A67, 7:5-8. This enables the orthodontist to exert fine control over

the forces being applied to position the teeth.

In order to move the teeth, the archwire needs to be secured to the brackets

to transmit the desired force to the teeth. This is done using "ligatures."

Traditionally, ligatures are small elastomeric O-rings or fine metal wires. A64,

1:25-27. The brackets, slots, archwires, and ligatures are small, making them challenging to install and maintain. Self-ligating brackets eliminate the need for ligatures. *Id.* at 1:29-32. Ormco has developed and patented a series of improved self-ligating brackets. These self-ligating brackets typically use a slide or latch to retain the archwire in the slot in the bracket. A64, 1:27-32.

### C.    Background

For over fifty years, Ormco has been the leading provider of premium orthodontic products. A367. Ormco has a well-deserved reputation for innovation. *Id.* Ormco developed a substantial patent portfolio covering numerous innovations, ranging from brackets, to archwires, to tools used by orthodontists. *Id*. This lawsuit involves six Ormco patents relating to self-ligating brackets. The following figures, from the '896 patent, depict one of Ormco's self-ligating brackets.



A60. Fig. 1, on the left, depicts slide 14 (highlighted in red) withdrawn from the bracket, for illustrative purposes. Normally, the slide (red) would be partially inserted into the bracket. In operation, the ligating slide remains engaged in the bracket but is positioned in the open position to expose the archwire slot (yellow). A368.

Fig. 2, on the right, depicts the bracket with the slide (red) in the closed position. In this closed position, the archwire slot 16 (yellow) is covered by the slide. When installing braces, an orthodontist first places the archwire into the archwire slot while the ligating slide is in the open position (Fig. 1). The

orthodontist then moves the ligating slide to the closed position (Fig. 2), securing

the archwire without requiring a separate ligature. A368.

Dr. Dwight Damon is a pioneer in the development of self-ligating brackets.

Among the improvements Dr. Damon made are the innovations disclosed and

claimed in Damon, U.S. Patent No. 7,704,072, for an "Orthodontic Bracket,"

which is assigned to Ormco. A103-41. This bracket includes a sliding member that

is cantilevered over the archwire slot, rather than spanning the slot and being

engaged at both ends of the slide, as is the '896 bracket, depicted above.



A107.

Ormco made improvements to the Damon bracket, including inventions by

Todd Oda, which are the subject of the '896 patent. Ormco found that the

cantilevered slide in the Damon bracket sometimes opens and admits food. Ormco

also discovered that the ligating slide has a tendency to open spontaneously,

causing the archwire to slide out of the slot, disrupting the patient's treatment.

Oda's invention resolves these issues, first, by positioning the slide so that as it is

inserted gingivally, the slide does not interfere with the gums; and second, by the

slide engaging the bracket on both sides of the archwire slot in the closed position

("support surface" and "ledge"), preventing the bracket from inadvertently

opening.



FIG. 3

A61.

## D.    The Oda '896 Patent

The '896 self-ligating bracket includes a bracket body, which is mounted on

a tooth, and a ligating slide. A64, 2:26-44. The bracket body includes a support

surface, an archwire slot, and a ledge disposed on the opposite side of the archwire

slot from the support surface. *Id.* The ligating slide is moved along a translation plane in a slide engagement track in the bracket body between an open position—in which the archwire can be inserted into the slot—and a closed position—in which the slide extends over the archwire slot from one side to the other. The slide engages the bracket on both sides of the slot, retaining the archwire. *Id.*

The specification makes clear that the specific orientation of the bracket in the preferred embodiments and the patent drawings is merely illustrative and is not limiting:

> [T]he orthodontic bracket 10 of the invention is described herein using a reference frame attached to a molar tooth of the lower jaw. Consequently, and as used herein, terms such as labial, lingual, mesial, distal, occlusal, and gingival used to describe bracket 10 are relative to the chosen reference frame. ***The invention, however, is not limited to the chosen reference frame and descriptive terms, as the orthodontic bracket 10 of the invention may be used on other teeth and in other orientations within the oral cavity.***

A65, 4:30-40 (emphasis added).

### 1. The "Support Surface" and "Ledge" Are Disclosed Broadly and Are Not Constrained by the Additional Functional Limitations Identified by the Magistrate Judge

The subject matter of the '896 patent is described with reference to six illustrative embodiments. A64, 2:26-A65, 3:36. These embodiments are illustrative only and are not limiting of the invention as claimed. A65, 4:6-15.

> Although the invention will be described next in connection with certain embodiments, the invention is not limited to

practice in any one specific type of self-ligating orthodontic bracket. The description of the embodiments of the invention is intended to cover all alternatives, modifications, and equivalent arrangements as may be included within the spirit and scope of the invention as defined by the appended claims. In particular, those skilled in the art will recognize that the components of the embodiments of the invention described therein could be arranged in multiple different ways.

A65, 4:6-16. Certain claims are directed to these preferred embodiments, others are not.

The application that matured into the '896 patent has included some comparable version of claim 1, throughout prosecution:

1. A self-ligating orthodontic bracket for coupling an archwire with a tooth, comprising:

a bracket body configured to be mounted to the tooth, the bracket body including a ***support* surface[]**and an archwire slot including a base surface and with opposing first and second slot surfaces extending away from a base surface, the base surface being interposed between the opposing first and second slot surfaces, the ***support surface*** being acutely angled with respect to the base surface[]; and

a movable member coupled with the bracket body and movable between an opened position in which the archwire is insertable into the archwire slot and a closed position in which the movable member retains the archwire in the archwire slot,

wherein the movable member comprises a first portion and a second portion extending at an acute angle from the first portion, the first portion engaging the acutely angled ***support surface*** of the bracket body when the movable member is in the closed position, the second portion being generally parallel to the base surface and extending across the archwire slot from the first slot surface to the second slot surface when the movable member is in the closed position.

13

A651 ([] indicates where amendments were removed to depict the prior claim language). Original claim 1 discloses that the "support surface" is merely a portion of the bracket body. The support surface supports the movable member (slide). No further limitation of the "support surface" is recited in original claim 1. The support surface may be on either side of the slot and the slide may be inserted from either the occlusal or gingival sides of the bracket. Because of the original claims are part of the specification, the subject matter of claim 1 is supported by the specification. Significantly, this broadest independent claim has at all times allowed the "support surface" to be on either side of the archwire slot. At no time has it included any requirement that the "support surface" is limited to one side of the archwire slot, or the other.

Additional express limitations of claim 1 specify that the support surface: (1) be acutely angled with respect to the base surface; (2) be located on the opposite side of the slot from the ledge; and (3) "engage" a first portion of the slide when the slide is in the closed position. A68, 10:28-56. Nowhere in original claim 1 is the "support surface" limited by whether or not it defines a slide engagement track, whether or not it "supports and guides" the movable member, or whether or not it supports the movable member during its movement between the open and closed positions.

Similarly, the "ledge" is simply a protrusion from the bracket in the labial direction beyond the archwire slot. A67, 7:24-27. Nowhere is the ledge limited to being on one side of the slot or the other. And nowhere is there any exclusion that the ledge cannot contact the slide in the open position. *Id.* at 7:24-38. Rather, additional express limitations of the asserted claims specify that the ledge is in contact with the slide when the slide is in the closed position. A68, 10:37-38. Nothing in the '896 patent limits the "ledge" to being in contact with the slide only in the closed position.

The specification describes alternative embodiments in different terms. The asserted claims, as did the originally filed claims, recite a "support surface." Preferred embodiments, on the other hand, describe a "slide engagement track," and a "translation plane." The district court erred by, among other things, equating the "support surface," "slide engagement track," and "translation plane." A41; A20-21.

### 2. Nothing in the Specification Requires the "Support Surface" to Support and Guide the Slide During Its Movement from the Open to the Closed Position and the Ledge to Contact the Slide Only in the Closed Position

Ormco concedes that in certain preferred embodiments, the "support surface" and "ledge" are depicted in the patent drawings in the manner articulated by the Magistrate Judge. These limitations are also evident from express claim

limitations recited in other, narrower claims. Nonetheless, the asserted claims are not limited in this manner.

The '896 patent discloses a first embodiment, A64, 2:26-52, depicted in Figs. 1 and 2, A60. An orthodontic bracket includes a bracket body configured to be mounted to a tooth and an archwire slot. A64, 2:26-29. The archwire slot has a base surface generally defining a base plane. *Id.* at 2:28-29. The bracket body includes a slide engagement track generally defining a translation plane. *Id.* at 2:29-30. This translation plane is acutely angled with respect to the base plane. *Id.* at 2:31-32.

A ligating slide engages the slide engagement track of the bracket body and is movable along the slide engagement track parallel to the translation plane. *Id.* at 2:32-34. The slide moves between an open position, in which an archwire can be inserted into the archwire slot, and a closed position, in which the archwire is retained within the archwire slot. *Id.* at 2:35-37. The translation plane may be angled between 10 and 25 degrees relative to the base plane. *Id.* at 2:37-40.

In this first embodiment, the ligating slide 14 includes a surface "confronting" the slide engagement track 56 having a first and second portion. *Id.* at 2:45-47. This "confronting" relationship includes but does not require engagement. Rather, in the closed position, a first portion of the slide engages the slide engagement track 56. *Id.* at 2:47-48. A second portion of the slide covers the

16

archwire slot 16 when the ligating slide 14 is in the closed position and is angled with respect to the first portion so that the second portion is generally parallel to the base plane. *Id*. at 2:48-52.

Although the patent drawings depict preferred embodiments having the functional relationships identified by the Magistrate Judge, the specification does not limit the "support surface" or "ledge" to these functions. Rather, it discloses that the slide 14 engages the "slide engagement track" 56, not the "support surface" 46.

Outside of the claims, the specification refers to the "support surface" 46 in only a limited number of places: A66, 5:48-61 (seven occurrences with respect to the first embodiment); *id.* at 6:45 (locking mechanism of the second embodiment); A67, 7:51 (locking mechanism of the third embodiment); *id.* at 8:17-19, 8:41 (locking mechanism of the fourth and fifth embodiments). The "slide engagement track" 56 is described as a separate structure and is separately numbered. Specifically, the "slide engagement track" 56 also comprises grooves 48, 50 (depicted in blue) and guides 52, 54 (depicted in green).



A60, Fig. 1 (preferred embodiment). "Planar support surface 46 including grooves

48, 50, and guides 52, 54 ***collectively define a slide engagement track*** 56 for

supporting and guiding ligating slide 14 within bracket body 12." A66, 5:61-64

(emphasis added).

Second, the "planar support surface" 46 including the grooves 48, 50 and

guides 52, 54 collectively define the "slide engagement track" 56. The "planar

support surface" alone does not, nor is the "support surface" the same as the

"translation plane."

> The bracket body 12 further includes a generally planar support
> surface 46 projecting in a generally labial-gingival direction
> from slot surface 44. Support surface 46 may include a pair of
> slide grooves 48, 50 extending in the occlusal-gingival direction
> at opposed mesial-distal ends of support surface 46. A pair of
> opposed guides 52, 54 are carried by support surface 46 and are

18

> positioned on respective mesial and distal sides 26, 28 thereof.
> The guides 52, 54 are generally L-shaped each having a first leg
> projecting from support surface 46 in the labial direction. Guide
> 52 has a second leg projecting in the distal direction while
> guide 54 has a second leg projecting in the mesial direction so
> that collectively, guides 52, 54 partially overlie support surface
> 46. Planar support surface 46 including grooves 48, 50 and
> guides 52, 54 *collectively define a slide engagement track 56*
> *for supporting and guiding ligating slide 14 within bracket*
> *body 12.*

A66, 5:48-64 (emphasis added). The specification discloses that the slide engages

the "slide engagement track," A64, 2:32-37, not merely a planar portion of the

"support surface" corresponding to the "translation plane." Specifically, the slide

can engage the guides and grooves, rather than a planar portion of the support

surface 46. This is consistent with use of the term "confronting," rather than

engaging. Thus, the Magistrate Judge's reading, equating the three structures—the

support surface, the slide engagement track, and the translation plane—is

inconsistent with the specification.

Nowhere in this first embodiment is the "ledge" described.

A second embodiment is also disclosed, *id.* at 2:53-63, in which the bracket

body includes a "confronting side" adapted to face the teeth on the opposite jaw.

The confronting side may include a recess adjacent an outer end that defines a

"generally planar surface" 38 which is substantially orthogonal to the base plane.

A66, 5:19-24. This "generally planar surface" 38 is an entirely different structure

than "support surface" 46. Rather, it is a place to grip the bracket, A64, 2:58-63, and is depicted in Fig. 2 as 38 (highlighted in blue).



A60, Fig. 2 (preferred embodiment).

The "support surface" 46 is disclosed in this second embodiment only in connection with the resilient locking member. A66, 6:45. Nowhere in this description is the "ledge" described. Nor does this second embodiment in any way limit either the "support surface" or "ledge" to the specific functions identified by the Magistrate Judge, namely, contacting the claimed movable member only when the movable member is in the closed position.

A third embodiment discloses a further variation of the locking mechanism. The movement of the ligating slide relative to the bracket body may be restricted so as to prevent the ligating slide from disengaging from the bracket body. A64,

2:64-67. The bracket body may include one of a projecting portion or a receiving

portion, and the ligating slide may include the other. A64, 2:67-A65, 3:6. This

prevents the ligating slide from inadvertently opening. A65, 3:6-10.

As with the second embodiment, the "support surface" is disclosed in this

third embodiment only in relation to the locking mechanism. A67, 7:51. Nothing in

this discussion of the third embodiment equates the "support surface" with the

"slide translation track" or the "translation plane." Nor is there any disclosure in

this third embodiment that requires that the "support surface" support and guide

the slide throughout its travel from the open to the closed positions.

The "ledge" 90 (shown best in Fig. 2, p. 9, and Fig. 3, p. 11 *supra*), is

described in this third embodiment, A67, 7:26-31, as a projection of the bracket

body beyond the archwire slot:

> In yet another advantageous aspect of the invention, the ***labial
> portion 34 of occlusal side 22 extends in the labial direction
> beyond the archwire slot 16 to define a ledge***, generally shown
> at 90, extending in the mesial-distal direction. ***Ledge*** 90
> includes a labial surface 92 that is generally parallel to base
> plane 58. When the ligating slide 14 is moved to the closed
> position, the occlusal end of the second portion 88 on slide rails
> 70, 72 abuts the labial surface 92 of ***ledge*** 90 and is covered by
> labial portion 34 of occlusal side 22. In this way, food or other
> material in the oral cavity is prevented from contacting the
> occlusal edge of ligating slide 14 and inadvertently dislodging
> slide 14 to the opened position.

*Id.* at 7:24-38 (emphases added). Although the ledge is depicted as not engaging

the slide in the open position, nothing in the specification limits the ledge in this

way. Rather, switching the sides of the slot on which the ledge and support surface are placed is within the alternatives and modifications discussed above. A65, 4:5-16. Nothing in the specification requires that the "ledge" be in contact with the slide *only* when the slide is in the closed position. Nor is there any disclosure that the support surface must engage the slide throughout its movement.

A fourth embodiment (Fig. 4A) depicts an alternative locking arrangement. A61. In this fourth embodiment, a retaining pin projects from the slide engagement track, and the ligating slide includes a retaining slot. A64, 3:11-15. The retaining pin is received within the retaining slot. *Id.* at 3:16-19.

A fifth embodiment (Fig. 4B) depicts a retaining pin associated with the ligating slide and a retaining groove associated with the bracket body, operating in a similar manner as described above with respect to the fourth embodiment. A62.

The specification discloses a sixth embodiment (Figs. 5A and 5B) in which the locking mechanism is mounted in the side of the track. A62-63. The slide engagement track is bounded by at least one side wall having one of a projecting portion or a receiving portion, and the ligating slide includes a peripheral edge that confronts the side wall. A65, 3:24-33. The peripheral edge includes the other of the projecting or receiving portion. *Id.* at 3:30-33.

The "support surface" is discussed in conjunction with the fourth and fifth embodiments only in connection with the locking mechanism. As with the third

embodiment, nothing in this discussion equates the "support surface" with the "slide translation track" or the "translation plane." Although preferred embodiments disclose that some portion of the slide engagement track remains in contact with the slide when it is open, nothing in the specification requires that a planar portion of the "support surface" engage the slide in the open position. Nor is there any disclosure in these embodiments that requires the support surface to support and guide the slide throughout its movement from the open to the closed positions.

Nor is there any discussion of the "ledge" in connection with these embodiments. Rather, they each address the retaining pin arrangements depicted in Figs. 3, 4A, and 4B.

The Magistrate Judge erred in equating the "support surface" with the "slide translation track" and the "translation plane." A12, A22. The "support surface" 46 is depicted as a separate structure from the "slide translation track" 56. Specifically, it is the combination of the "support surface" with additional elements, namely, grooves 48, 50 and guides 52, 54, that *collectively* defines the "slide translation track" 56. A66, 5:61-64. Equating a planar component of one of these five elements (support surface) with the slide engagement track is error.

Although the "slide engagement track" defines the "translation plane," A64, 2:29-32, the "translation plane" 60 is not the same as either the "support surface"

or the "slide engagement track." Rather, the translation plane 60 is an abstract

geometric construct. It is the plane "generally defined" by the movement of the

slide. A66, 6:4-7. The slide engagement track 56 is disclosed as being parallel to

the "translation plane," *id.* at 6:10-16, not the same as the "support surface." Thus,

the Magistrate Judge erred in equating the complex three-dimensional shape of the

"slide engagement track," an undefined planar portion of the "support surface,"

and the abstract geometric "translation plane." Each is a separate element and,

although they may have elements in common in certain preferred embodiments,

they are not the same.

### E.    The Claims on Appeal

#### 1.    Claims 1, 2, 5, and 7 Are Not Limited in the Manner Construed by the Magistrate Judge

On its motion for preliminary injunction, Ormco asserted only claims 1, 2, 5,

and 7. The terms "support surface" and "ledge" appear in each of the asserted

claims:

> 1.    A self-ligating orthodontic bracket for coupling an
> archwire with a tooth, comprising:
> a bracket body configured to be mounted to the tooth, the
>       bracket body including a support surface, a ledge, and an
>       archwire slot including a base surface and opposing first
>       and second slot surfaces extending from the base surface,
>       the base surface being interposed between the opposing
>       first and second slot surfaces, the support surface being
>       acutely angled with respect to the base surface, and the
>       ledge opposing the support surface across the archwire

slot and including a surface that is generally parallel to
the base surface; and

a movable member coupled with the bracket body and movable
between an opened position in which the archwire is
insertable into the archwire slot and a closed position in
which the movable member retains the arch wire in the
archwire slot,

wherein the movable member comprises a first portion and a
second portion extending at an acute angle from the first
portion, the first portion engaging the acutely angled
support surface of the bracket body when the movable
member is in the closed position, the second portion
being generally parallel to the base surface and extending
across the archwire slot from the first slot surface to the
second slot surface when the movable member is in the
closed position.

A68, 10:27-53.

Claim 2 provides:

> 2.     The self-ligating orthodontic bracket of claim 1,
> wherein the ledge extends in the mesial-distal direction, the
> second portion of the movable member cooperating with the
> ledge when the movable member is in the closed position.

*Id*. at 10:54-57.

Claim 5 provides:

> 5. The self-ligating orthodontic bracket of claim 1,
> wherein the acute angle between the first portion and the second
> portion of the movable member is maintained during movement
> between the opened position and the closed position.

*Id*. at 10:64-67.

Claim 7 provides:

> 7. The self-ligating orthodontic bracket of claim 1, wherein the second portion of the movable member abuts the surface of the ledge that is generally parallel to the base surface when the movable member is in the closed position.

A69, 11:6-9.

## 2. The Non-Asserted Claims Inform the Construction of the Asserted Claims

Other claims of the '896 patent, although not asserted, are nonetheless material to the construction of the asserted claims of the '896 patent. For example, claim 6 provides:

> 6. The self-ligating orthodontic bracket of claim 1, wherein the support surface intersects one of the opposing first and second slot surfaces to define an edge of the archwire slot and the support surface defines a translation plane that intersects the other of the opposing first and second slot surfaces.

*Id.* at 11:1-5. Claim 6 contains a further limitation that the support surface of claim 1 defines a translation plane. Because claim 6 adds a further limitation to claim 1 on which it depends, the support surface of claim 1 ***may***, but need not, define a translation plane.

Claim 8 provides:

> 8. The self-ligating orthodontic bracket of claim 1, wherein a portion of the bracket body that includes the ledge extends beyond the movable member and is configured to prevent food or other material from inadvertently dislodging the member from the closed position.

*Id.* at 11:11-15. As these additional functions of the ledge are further limitations on the "ledge" of claim 1, by implication, the "ledge" of claim 1 is not so limited.

Similarly, claim 9 provides:

> 9. The self-ligating orthodontic bracket of claim 1, wherein a portion of the bracket body that includes the ledge provides a stop to prevent the movable member from overshooting the closed position as the movable member is being moved from the opened position to the closed position.

*Id.* at 11:16-20. Claim 9 adds additional limitations of a stop, or as the Magistrate Judge considered it, a locking mechanism. A42-43. Because claim 9 adds this further limitation to independent claim 1, by implication, claim 1 is not limited to the locking mechanism being on the same side of the slot. Rather, claim 9 requires that the locking mechanism be on whichever side of the slot the ledge is on. Claim 1 does not.

Thus, the claims of the '896 patent describe a range of alternatives of the configuration of the "support surface" and "ledge."

### F. The Accused WCT Brackets

The accused WCT brackets also have a "support surface" and a "ledge" as disclosed and claimed in the '896 patent. Ormco concedes that the support surface and ledge in the accused WCT device are not the same as the support surface and ledge of the preferred embodiments of the '896 patent. Nonetheless, properly

construed, they are among the alternatives, modifications, and equivalent

arrangements defined by the asserted claims. A65, 4:6-15.

The following figures depict WCT's H4 bracket:



A584 (dimensions redacted). Essentially, WCT has flipped the "support surface"

and "ledge" in the accused device relative to preferred embodiments of the '896

patent. Whereas the slide is inserted into the bracket from the gingival side in

preferred embodiments of the '896 bracket, the slide is inserted into the bracket

from the occlusal side in the accused H4 bracket. Whereas the bracket is tapered so

that it lies closer to the tooth at the occlusal end in preferred embodiments of the

'896 patent, it lies farther away from the tooth at the occlusal end in the accused

H4 device. Whereas the support surface may, but is not required to, support the slide throughout its movement in preferred embodiments of the '896 patent, the ledge may support the slide throughout its movement in the accused H4 device. Similarly, whereas the ledge is in contact with the slide only in the closed position in preferred embodiments of the '896 patent, the support surface is in contact with the slide only in the closed position in the accused H4 device.

None of these differences are implicated by a proper construction of the asserted claims because, properly construed, the asserted claims do not recite these functions.

### G. Course of the Proceedings

After learning of WCT's intent to launch the H4 bracket, Ormco wrote to WCT on March 6, 2013, expressing concern that the H4 bracket may infringe Ormco's patents. A345. Ormco asked for samples. A345. WCT refused. Instead, on March 8, 2013, WCT filed a declaratory judgment action that the H4 bracket does not infringe five Ormco patents. A300-05. On March 12, 2013, the U.S. Patent and Trademark Office ("Patent Office") granted Ormco the '896 patent, and, on March 15, 2013, Ormco counterclaimed for infringement of the '896 patent. A346-57.

Ormco moved for expedited discovery. A52. WCT again resisted. The Court ordered WCT to produce samples and engineering drawings. A53. After examining

the H4 bracket and confirming infringement, Ormco moved for a preliminary

injunction. A359-61. Ormco also moved for construction of the terms "support

surface" and "ledge." A952-73.

### H. The Magistrate Judge's Claim-Construction Ruling

The motions were assigned to the Magistrate Judge. The Magistrate Judge

limited "support surface" to "a surface on the bracket body that defines a slide

engagement track and therefore supports and guides the claimed movable member

during movement between open and closed positions." A25. The Magistrate Judge

limited "ledge" to "an area on the bracket body which contacts the claimed

movable member only when the movable member is in the closed position." *Id.*

#### 1. The Magistrate Judge Improperly Imported Limitations from the Specification into the Claims

None of these limitations—equating the support surface with the slide

engagement track, supporting and guiding the movable member during movement,

and limiting the ledge to contact the movable member only in the closed position—

are recited in any of the claims asserted on the preliminary injunction motion. They

are, undeniably, disclosed as features of certain preferred embodiments. They are

depicted in the patent drawings and some are recited in certain narrower claims.

Nonetheless, they are not limitations of the asserted claims.

## 2.    The Magistrate Judge Erred in His Analysis of the Claims

The Magistrate Judge began the Preliminary Injunction Hearing by requiring Ormco's counsel to identify "the one defining characteristic" of the invention. He later asked the same of WCT's counsel. A879, ll. 12-16, and A893 ll. 9-11. Ormco respectfully submits that this singular focus on "one defining characteristic" likely biased the Magistrate Judge's analysis toward the preferred embodiments. A22.

Apart from this singular focus, A879, A893, Ormco does not take issue with the Magistrate Judge's articulation of controlling precedent, A7-10. Rather, the Magistrate Judge erred in placing undue reliance on the specification and in importing limitations from the specification into the claims.

First, the Magistrate Judge held that use of the article "the" to modify "support surface" in the asserted claims has the effect of "limiting the device to a single support surface." A35. Based on this misunderstanding, the Magistrate Judge held that the claimed bracket cannot have more than one support surface. *Id.* This is error. *See Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342-43 (Fed. Cir. 2008) ("That 'a' or 'an' can mean 'one or more' is best described as a rule, rather than merely as a presumption or even a convention. . . . The subsequent use of the definite articles 'the' or 'said' in a claim to refer back to the same claim term does not change the general plural rule, but simply reinvokes that non-singular meaning."); *Free Motion Fitness, Inc. v. Cybex Int'l, Inc.,* 423 F.3d 1343,

31

1350-51 (Fed. Cir. 2005) (rejecting the argument that "the" denotes only one

because "the" presumptively means "one or more" when used with the transitional

phrase "comprising.")

The Magistrate Judge's also erred in failing to appreciate that that the

transitional term "comprising" is open-ended. *Exergen Corp. v. Wal-Mart Stores,*

*Inc.*, 575 F.3d 1312, 1319 (Fed. Cir. 2009) (comprising is well understood to mean

"including but not limited to"); *MagSil Corp. v. Hitachi Global Storage*

*Technologies, Inc.*, 687 F.3d 1377, 1383 (Fed. Cir. 2012) ("comprising" as a

transition "signals that the entire claim is presumptively open-ended" (*quoting*

*Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1371 (Fed. Cir. 2005));

*Invitrogen Corp. v. Biocrest Mfg., L.P.,* 327 F.3d 1364, 1368 (Fed. Cir. 2003)

("comprising" is open-ended and allows for additional steps).

Second, the Magistrate Judge considered the claim language in view of the

specification. A35-43. The Magistrate Judge recognizes that he is required to strike

a balance, trying to "capture the scope of the actual invention, rather than strictly

limit the scope of claims to disclosed embodiments or allow the claim language to

become divorced from what the specification conveys is the invention."

*Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296 1305 (Fed. Cir.

2011); A14-15. Rather than striking this balance, however, at WCT's urging, he

placed undue reliance on preferred embodiments.

Specifically, the Magistrate Judge noted that WCT "cites *an embodiment described in the specification* which describes the support surface as defining the slide engagement track, and cites the advantage of an angled relationship between the slide engagement track and the base surface of the archwire slot." A40 (emphasis added). After citing various portions of the specification, A20-21, none of which refer to the "support surface" and none of which require the slide to engage the support surface throughout its travel, the Magistrate Judge incorrectly equates the "support surface" with both the "slide engagement track" and the "translation plane." A21, A23.

After accurately recounting Ormco's position that the support surface supports the slide in the closed position, A39, the Magistrate Judge promptly rejected it, characterizing Ormco as focusing almost exclusively on the claim language, A38. Specifically the Magistrate Judge rejected Ormco's "argument" that "the court may not import limitations from the specification into its construction," commenting that "Ormco is unable to substantiate its position with relevant case law." A39. Yet, Ormco provides ample case law on this point. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) (en banc); *McCarty v. Lehigh Valley R.R. Co.*, 160 U.S. 110, 116 (1895); *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1354 (Fed. Cir. 2012); *Silicon Graphics, Inc. v. ATI Techs., Inc.*, 607 F.3d 784, 792 (Fed. Cir. 2010); *Abbott Labs. v. Sandoz, Inc*., 566 F.3d

1282, 1288 (Fed. Cir. 2009); *Lampi Corp. v. Am. Power Prods., Inc.*, 228 F.3d 1365, 1378 (Fed. Cir. 2000); *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998).

Instead, the Magistrate Judge held that "the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.' " A39-40 (quoting *Vitronics Corp. v. Conceptronics, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). Ormco agrees that the specification is always relevant and that it may be dispositive. *Vitronics*, 90 F.3d at 1582. Nonetheless, limitations that are present in the specification cannot be imported into the claims. *Phillips*, 415 F.3d at 1323; *McCarty*, 160 U.S. at 116.

WCT tries to justify this error, arguing that Oda acted as his own "lexicographer" giving "support surface" a specialized meaning. A19. Although he never expressly ruled whether or not Oda does act as his own lexicographer, WCT's argument misdirected the Magistrate Judge to read into the term "support surface" features of the preferred embodiments.

Specifically, the Magistrate Judge relied on excerpts from the Abstract, Background, and Summary of the Invention to define the "support surface" and "ledge." A18-20. The Abstract, Background, and Summary, however, never mention either "support surface" or "ledge." The Magistrate Judge relied instead

on references to the "translation plane" and the general function of the bracket. A20.

The Magistrate Judge defined "support surface" as the "translation plane," A15, A16, noting, incorrectly, that "[t]he phrase 'support surface' is not used in conjunction with any other portion of the bracket," A21-21, Yet, "support surface" 46 expressly includes additional elements, namely, grooves 48, 50, and guides 52, 54. A66 at 5:60-61.

Third, the Magistrate Judge relied heavily on the locking mechanism of preferred embodiments of the invention to capture the "meaning" of the invention. A21-22. The Magistrate Judge held:

> The patent, viewed in the context of the specification, describes a device with several aspects and potential embodiments. It does not, however, describe a bracket that is merely characterized by a surface on the bracket, in contact with the ligating slide, that is at an acute angle to the base of the archwire slot. The invention in question is directed primarily at the problem of contact between the ligating slide and the patient's gum tissue. Ormco's proposed construction does not capture the meaning of the patent and is both internally inconsistent with the claim language and contrary to the patent's disclosure as a whole. With respect to "support surface," then, the claim language and the specification do not support the narrow construction urged by Ormco.
>
> The court hereby adopts the construction of "support surface" proposed by WCT.

*Id.* The canons of claim construction do not authorize the Magistrate Judge to limit the claims to the problem to which the invention is "primarily directed," or the

"meaning of the patent." Rather, the claims themselves, the specification, and the prosecution history are the primary guides to construction.

The Magistrate Judge made a comparable holding with respect to the term "ledge." A22. "[U]nder [WCT's] construction of 'support surface' the ledge is only in contact with the movable member when it is in the closed position." *Id.*

Based on this erroneous construction, the Magistrate Judge denied Ormco's motion for a preliminary injunction. In his subsequent *Markman* decision, the Magistrate Judge maintained this construction, A25, and entered a final judgment of noninfringement, A6-25; A1-5.

### 3. The Magistrate Judge's Erroneous Claim Construction Is Critical to All Issues on This Appeal

Ormco appeals the denial of its motion for a preliminary injunction (Appeal No. 13-1679) and the final judgment of noninfringement (Appeal No. 14-1692). The Magistrate Judge's claim-construction ruling is critical to both decisions. Absent modification of the claim construction, Ormco concedes that it cannot establish infringement.

The Magistrate Judge resolved the motion for preliminary injunction based solely on Ormco's likelihood of success on infringement and did not reach the remaining issues: likelihood of success on validity; irreparable harm; balance of the hardships; and the public interest. A46-47. Consequently, they are not presented for review on this appeal.

Ormco respectfully requests that this Court vacate the Magistrate Judge's incorrect claim construction, determine the proper construction of the terms "support surface" and "ledge," and remand the case to the district court for further proceedings consistent with the proper claim construction.

## IV. SUMMARY OF THE ARGUMENT

As a matter of law, the Magistrate Judge erroneously construed "support surface" and "ledge" to include limitations from the specification that are not recited in the claims.

The Magistrate Judge construed "support surface" to be "a surface on the bracket body that defines a slide engagement track and therefore supports and guides the claimed movable member during movement between open and closed positions." A25. Yet, express limitations of the claim already require the "support surface" to be located across the archwire slot from the ledge and that it support at least one "portion" of the slide in its closed position. Construing the term "support surface" to include these additional limitations is improper.

Although the "support surface" including the grooves 48, 50 and guides 52, 54 collectively define a slide engagement track in a preferred embodiment, it does not limit all embodiments. A planar portion of the "support surface" is not the same as the entire "slide engagement track" or the "translation plane." Nothing in the asserted claims requires that the "support surface" remain in contact with the

movable member throughout its movement. These additional limitations are not found in the asserted claims and go well beyond the common, ordinary meaning of the term "support surface." Further, they are contradicted by the usage of the term in other claims.

Based on this erroneous construction of "support surface," the Magistrate Judge construed "ledge" to be "an area on the bracket body which contacts the claimed movable member only when the movable member is in the closed position." A25. The Magistrate Judge limited "ledge" based on functions that are inherent in his incorrect construction of "support surface."

Improperly limiting the "support surface" to the side of the archwire slot where the slide is inserted into the bracket forces the "ledge" to the opposite side of the archwire slot where the bracket engages the slide only in the closed position. Undeniably, this is a feature of preferred embodiments of the invention. Yet, nothing in the broader asserted claims requires this limitation. These additional limitations are not part of the common, ordinary meaning of "ledge," are contradicted by the usage of the term in other claims, and were improperly imported from the description of preferred embodiments of the invention in the specification.

The Magistrate Judge moved too far away from the common, ordinary meaning of the terms themselves in favor of his own impression of "the meaning

38

of the patent," strict consistency with portions of the specification describing preferred embodiments, and what he considered to be "the patent's disclosure as a whole." A43. In doing so, the Magistrate Judge ignores certain canons of claim construction. Specifically, he rejects the common, ordinary meaning of "support surface" and "ledge." Both are plain English terms having common, ordinary meanings. The inventor gave these terms no special definition. Nor did Ormco disavow or disclaim any claim scope, either in the specification or during prosecution. A1101. WCT does not contend that Ormco made any such disavowal or disclaimer.

Rather, WCT argues that the inventor used these terms "idiosyncratically" defining them "by implication." A1083. This is not enough. Disclaimer or disavowal must be both clear and unmistakable. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325-26 (Fed. Cir. 2003) ("[O]ur precedent requires that the alleged disavowing actions or statements made during prosecution be both clear and unmistakable.").

Moreover, the remaining claims of the '896 patent, as well as the doctrine of claim differentiation, further support that the terms "support surface" and "ledge" are not properly limited in the manner construed by the Magistrate Judge.

Because the Magistrate Judge erred by importing these additional limitations from the specification into the claims, Ormco requests that the judgment be

vacated. Specifically, Ormco requests that this Court construe these terms consistent with their common, ordinary meaning as a surface of the bracket that supports the slide in at least one position ("support surface") and as a portion of the bracket that extends from the bracket body beyond the slot ("ledge"). Ormco respectfully requests that the Court remand this case to the district court for further proceedings consistent with this construction.

## V.     ARGUMENT

### A.     The Magistrate Judge's Claim Construction Is Reviewed *De Novo*

Analyzing infringement is a two-step process. *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999). First, the court construes the meaning and scope of the asserted claim. *Id.* Claim construction is a matter of law reviewed *de novo*. *Sentry Prot. Prods., Inc. v. Eagle Mfg. Co.*, 400 F.3d 910, 913 (Fed. Cir. 2005).

### B.     The Legal Principles Governing Claim Construction Are Not Disputed

When construing claims, a court must begin by "look[ing] to the words of the claims themselves . . . to define the scope of the patented invention." *Phillips*, 415 F.3d at 1312 (quoting *Vitronics*, 90 F.3d at 1582); *Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 805 (Fed. Cir. 2007). The task of comprehending those words is not always difficult. "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay

judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Acumed*, 483 F.3d at 805 (quoting *Phillips*, 415 F.3d at 1314).

District courts are not required to construe every limitation in an asserted claim. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008). When a term has more than one ordinary meaning, or when reliance on a claim term's ordinary meaning does not resolve a dispute regarding the scope of the asserted claim, the district court has a duty to resolve the dispute by determining the correct scope and meaning of the disputed term as a matter of law. *Id. at* 1362-3. Nonetheless, in some cases, such as this one, the ordinary meaning may be readily apparent.

"A *heavy presumption* [exists] that claim terms carry their full ordinary and customary meaning, unless it can [be] show[n] the patentee expressly relinquished claim scope." *Epistar Corp. v. Int'l Trade Comm'n*, 566 F.3d 1321, 1334 (Fed. Cir. 2009) (emphasis added). The general rule is that a term should be given its plain meaning. *See Uship Intellectual Props., LLC v. United States*, 714 F.3d 1311, 1313 (Fed. Cir. 2013) (citing *Phillips*, 415 F.3d at 1313). "There are only two exceptions to this general rule: (1) when a patentee sets out a definition and acts as his own lexicographer, or (2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution." *Id*. (emphasis added) (citing

*Thorner v. Sony Computer Entm't Am., LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)); *see also Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 723 F.3d 1363, 1373 (Fed. Cir. 2013). Neither applies here.

Lexicography permits a patent owner to deviate from the plain meaning and define a term. A court may review a patent's specification "to determine whether the inventor has used any terms in a manner ***inconsistent*** with their ordinary meaning." *Vitronics*, 90 F.3d at 1582 (emphasis added). A patent owner deviates from plain meaning only when it does so with "with reasonable clarity, deliberateness, and precision." *See Teleflex Inc. v. Ficosa N.A. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002) (quoting *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994)).

Disclaimer or disavowal may result from the patent owner's statements in the specification or prosecution history. Disclaimer is found only when a patent owner's statements "manifest exclusion or restriction, representing a clear disavowal of claim scope." *Id.*; *see also Teva Pharms.*, 723 F.3d at 1373 (requiring "clear and unmistakable disclaimer of claim scope" (citing *Omega Eng'g*, 334 F.3d at 1326 n.1)).

The court may refer to the specification to aid in its construction of disputed terms. *See Phillips*, 415 F.3d at 1315-17. Nonetheless, the Federal Circuit has strongly cautioned courts not to import limitations from the specification into the

claims. *See Deere*, 703 F.3d at 1354 ("While claim terms are understood in light of the specification, a claim construction must not import limitations from the specification into the claims." (citing *Phillips*, 415 F.3d at 1323)); *Silicon Graphics Inc. v. ATI Techs. Inc.*, 607 F.3d 784, 792 (Fed. Cir. 2010). The Supreme Court recognized this proscription over a century ago: "if we once begin to include elements not mentioned in the claim, in order to limit such claim . . . , we should never know where to stop." *See Phillips*, 415 F.3d at 1312 (quoting *McCarty*, 160 U.S. at 116).

### C.    The Magistrate Judge Erroneously Construed the Claims

Although the Magistrate Judge articulated the governing legal standards, A7-10, he failed to follow them. Instead, he placed undue weight on preferred embodiments of the invention.

WCT sought an extremely narrow construction of "support surface" and "ledge" in order to avoid infringement. It asked the Magistrate Judge to rely on descriptions of the preferred embodiments and import limitations from these preferred embodiments into the claims. A1088. If adopted, the Magistrate Judge would have to find no infringement. This is precisely what he did.

### 1. The Magistrate Judge Improperly Rejected the Authority Identified by Ormco that Limitations Cannot Be Read from the Specification into the Claims

The Magistrate Judge began his claim-construction analysis by mischaracterizing Ormco's argument as focusing "almost exclusively on the claim language." A18. Ormco respectfully disagrees with this characterization. The Magistrate Judge's comment that "beyond arguing that a court may not import limitations from the specification into its construction of the claim language, Ormco is unable to substantiate its position with relevant case law," *id.*, is not correct. Ormco provided ample authority on this point. A957, A961; A966, A967.

As the court noted in *Acumed*:

> The task of comprehending those words is not always a difficult one. "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words."

*Acumed*, 483 F.3d at 805 (quoting *Phillips*, 415 F.3d at 1314). Whether or not resort to the specification is necessary, limitations that are not present in the claims cannot be imported into the claims from the specification. *Phillips*, 415 F.3d at 1323; *McCarty*, 160 U.S. at 116; *Deere*, 703 F.3d at 1354; *Silicon Graphics*, 607 F.3d at 792; *Abbott Labs.*, 566 F.3d at 1288; *Lampi*, 228 F.3d at 1378; *Comark*, 156 F.3d at 1187.

2.    **The Magistrate Judge Erred in Crediting WCT's Arguments that Ormco Acted as Its Own Lexicographer Where Ormco Gave No Special Meaning to the Terms Other Than Their Common, Ordinary Meaning**

WCT contends that Oda acted as his own lexicographer by using the term "idiosyncratically." A994; A19. The Court can find that a patentee deviated from the plain meaning of its claim terms and acted as its own lexicographer, only if it did so "with reasonable clarity, deliberateness, and precision." *Teleflex*, 299 F.3d at 1325 (quoting *In re Paulsen*, 30 F.3d at 1480). The patentee in this case did not. By WCT's own admission, its argument is based on implication. A997 (acknowledging the lack of any explicit definition and arguing from implication).

WCT cites *Bell Atlantic Network Serv., Inc. v. Covad Communications Group, Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001), contending that "[w]hen a patentee uses a claim term throughout the entire patent specification, in a manner consistent with only a single meaning, he has defined that term 'by implication.'" A1083. But WCT's premise is wrong. Oda did not use the term "support surface" throughout the specification in a manner consistent with only WCT's proposed construction. Nowhere does the specification require that some undefined planar portion of the "support surface" engage the slide, as opposed to the guides and grooves, let alone in either the open or closed positions.

Perhaps recognizing the failure of this argument, WCT contends that Ormco acted as its own lexicographer by referencing some of the problems the invention

was designed to address. A994-96. This Court has repeatedly rejected

incorporating limitations into the claims based on statements in the specification

about a particular purpose, advantage, or function of the claimed invention. *See*

*Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1301 (Fed. Cir.

2003) ("Advantages described in the body of the specification, if not included in

the claims, are not per se limitations to the claimed invention." (citation omitted)).

In *Laryngeal Mask Co. Ltd. v. Ambu*, 618 F.3d 1367, 1372 (Fed. Cir. 2010),

defendant argued that the specification defined, by implication, the term

"backplate" to include a tube joint. Although the preferred embodiment included

this feature, the Court held that the specification did not clearly evidence the

patentee's intent to give "backplate" this unique meaning. Similarly, although the

'896 patent discloses that the "planar support surface" 46 including grooves 48, 50

and guides 52, 54 collectively define a "slide engagement track" 56 in a preferred

embodiment, A66, 5:61-64, the '896 specification does not "clearly indicate" that

Oda intended to give "support surface" this unique meaning, different from its

ordinary and customary meaning. *See Laryngeal Mask Co. Ltd.*, 618 F.3d at 1372.

In *E-Pass Technologies, Inc. v. 3Com Corp.*, 343 F.3d 1364, 1365 (Fed. Cir.

2003), the Court vacated the district court's grant of summary judgment of

noninfringement based on an improperly narrow construction of "multi-function

card." The issue in *E-Pass* was, as it is in this case, whether the term "card" should

be given its plain and ordinary meaning, or instead be limited to a standard credit-card size based on statements in the specification. The district court limited it to a standard credit-card-sized card, relying on certain "Advantages of the Invention." *Id*. at 1369. The Federal Circuit rejected this construction. *Id*. at 1370. The district court improperly limited the scope of the term based on the "perceived purpose served by the invention." *Id*. The Federal Circuit clarified that:

> [t]he court's task is not to limit claim language to exclude particular devices [from the scope of the claims] because they do not serve a perceived "purpose" of the invention. Rather, ***the district court's function is to interpret claims according to their plain language unless the patentee has chosen to be his own lexicographer in the specification or has clearly disclaimed coverage during prosecution.*** An invention may possess a number of advantages or purposes, and there is no requirement that every claim directed to that invention be limited to encompass all of them.

*Id*. (emphasis added) (footnote and citation omitted). The plain meaning was the correct construction.

Similarly, in *Golight Inc. v. Wal-Mart Stores, Inc*., 355 F.3d 1327, 1331 (Fed. Cir. 2004), this Court held that patentees "were not required to include within each of their claims all of these advantages or features described as significant or important in the written description." "If everything in the specification were required to be read into the claims, or if structural claims were to be limited to devices operated precisely as a specification-described embodiment is operated, there would be no need for claims." *Id*. (quoting *SRI Int'l v. Matsushita Elec. Corp.*

*of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985)); *see also Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 908-09 (Fed. Cir. 2004) ("The fact that a patent asserts that an invention achieves several objectives does not require that each of the claims be construed as limited to structures that are capable of achieving all of the objectives.").

Yet, the Magistrate Judge expressly stated in his opinion that he limited Ormco's asserted claims to the problems purportedly addressed by the claimed invention. A19-22. This is error.

Nor did Ormco act as its own lexicographer in the various passages cited by the Magistrate Judge. A19-21. None of the cited passages limits the "invention" to only these features of preferred embodiments. None of the cited passages exhibits the "clarity, deliberateness, and precision" required to specially define the terms "support surface" and "ledge." In fact, none of these passages even cites the "support surface" term. Ormco never set forth a clear, deliberate, and precise definition of "support surface" or "ledge" that is inconsistent with or varies their common, ordinary meanings.

Nor does the term "slide engagement track" establish that Ormco specially defined "support surface." A996. The "support surface" 46 and "slide engagement track" 56 are different structures, having different reference numerals. Although "planar support surface 46 including grooves 48, 50 and guides 52, 54 collectively

define a slide engagement track 56," A66, 5:61-64, this is not a definition of "support surface" in terms of unique lexicography. The term "slide engagement track" is not used in any claim of the '896 patent, let alone the asserted claims. Although "translation plane" is used in dependent claim 6, claim 6 is not asserted. Moreover, its use in claim 6 simply reinforces that the "translation plane" is a further limitation on the broader "support surface" in claim 1. Whether or not "slide engagement track" is a coined term—and it is not—the "support surface" 46 is a different element than the "slide engagement track" 56.

The Magistrate Judge relied on excerpts from the Abstract, Background, and Summary of the Invention sections of the specification to define the "support surface" and "ledge." A38-40. Yet, none of the Abstract, the Background, or the Summary of the Invention ever mention the terms "support surface" or "ledge." The Magistrate Judge relies instead on the "translation plane" and the general function of the bracket. A40. This is error. By adopting WCT's argument that the "support surface" is the same as the "slide engagement track" and the "translation plane," and requiring the "support surface" to perform the additional functions detailed in the specification for both, the Magistrate Judge improperly incorporated these additional limitations from the specification into the claims.

The Court in *Acumed* readily dispatched a comparable argument that the inventor acted as his own lexicographer. *Id*. "Although the specification often

describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments." *Id.* (quoting *Phillips*, 415 F.3d at 1323). The Court in *Acumed* also noted that the presence of dependent claims adding a further limitation raises a presumption that the limitation is not found in the independent claim. *Id.* at 806 (citing *Liebel-Flarsheim*, 358 F.3d at 910; *Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1234 (Fed. Cir. 2001); *Comark*, 156 F.3d at 1187, *Tandon Corp. v. U.S. Int'l Trade Comm'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987); *SunRace Roots Enter. Co. v. SRAM Corp.*, 336 F.3d 1298, 1303 (Fed. Cir. 2003); *Ecolab Inc. v. Paraclipse, Inc.*, 285 F.3d 1362, 1375-76 (Fed. Cir. 2002)).

### 3. The Magistrate Judge Erred by Importing Limitations from the Specification into the Claims

This Court has repeatedly held that details from the specification should not be imported into general claim terms. In *Phillips* the invention was a modular, steel-shell panel for making vandalism-resistant walls. *Phillips* at 1309. Every "baffle" disclosed in the specification was at an angle other than 90 degrees. Defendant argued that the term "baffle" should be limited to this angled orientation. The district court agreed and a panel of this Court affirmed, concluding that the applicant had used the term "baffle" in a restrictive manner. The panel dissent, however, noted that "there is no reason to supplement the plain meaning of

the claim language with a limitation from the preferred embodiment." *Id.* at 1310. The *en banc* Court agreed with the dissent.

The principal question in *Phillips* was: "the extent to which we should resort to and rely on a patent's specification in seeking to ascertain the scope of its claims." *Id.* at 1312. The Court held that the claims themselves provide guidance. For example, use of the term "'steel baffles' . . . strongly implies that the term 'baffles' does not inherently mean objects made of steel." *Id.* at 1314. So too, "acutely angled support surface" in claim 1 of the '896 patent does not inherently mean objects that are acutely angled.

After detailing the respective roles of the claims, specification, and prosecution history, and extrinsic evidence, *Id.* at 1311-24, the *en banc* Court applied these principles in construing "baffles." As do the claims of the '896 patent, the claims in *Phillips* include additional requirements on the baffles. *Id.* at 1324. As other claims of the '896 patent specify additional functions served by the "support surface," other claims in *Phillips* specify additional functions served by the baffles. *Id.* In *Phillips*, the added limitations of claim 2—for deflecting projectiles—evidenced that the "baffle" of claim 1 did not already include this limitation. So too, the added limitation of claim 6 of the '896 patent that the "support surface defines a translation plane" evidences that the "support surface" of claim 1 does not already include this limitation. *Id.* If the "support surface" of

51

claim 1 already was the translation plane, adding this limitation in claim 6 would be redundant. *Id.* at 1325.

This case is similar to *Acumed*, 483 F.3d 800. In *Acumed*, the patent dealt with a humeral nail, an orthopedic device for treating upper arm fractures. The specification described a nail with a smooth curve and stated further that it is "desirable" that the nail be inserted into a "broached" hole, which would exclude a curve having angled bends or small radius curves. Just as WCT argues that Ormco's "support surface" must be limited to the "slide engagement track" and "translation plane" of preferred embodiments of the invention, the defendant in *Acumed* argued that the nail must have a smooth curve excluding small discontinuities so that it would fit through a broached hole.

The court noted that "when construing claims, a court must begin by 'look[ing] to the words of the claims themselves.'" *Id.* at 805 (alteration in original) (quoting *Phillips*, 415 F.3d at 1312). The Court noted that "curvature" may include small discontinuities, for instance, an archway made from rectangular bricks. *Id.* Similarly, a support surface is merely a surface that supports the slide. It need not have further functions, regardless how desirable they may be.

Similarly, in *Callicrate v. Wadsworth Manufacturing, Inc.*, 427 F.3d 1361 (Fed. Cir. 2005), the Court was asked to resolve a similar situation in which preferred embodiments of the invention were limited to a specific configuration,

yet, the claim did not include the limiting language. *Callicrate* involved methods and apparatuses for castrating large animals. *Id.* at 1363. The specification disclosed a preferred embodiment of the trigger mechanism including a lever pivotally mounted on the body of the tool. *Id.* As does WCT in this case, the defendant asked the court to limit the claims to the preferred embodiment. *Id.* at 1367. And, as explained above for the '896 patent, the Federal Circuit noted in *Callicrate* that the claim language is broader than this limiting construction.

The Court noted that "[all] claims are indeed to be construed in light of the specification, as in the *Phillips* case itself, the district court in this case improperly imported limitations from the specification into the claims, thereby restricting the claims to coverage of a single embodiment." *Id.* at 1368 (citing *Phillips*, 415 F.3d at 1312); *see also Eolas Techs. Inc. v. Microsoft Corp.*, 399 F.3d 1325, 1337 (Fed. Cir. 2005) (commenting that it is improper to limit claims to the preferred embodiment).

The Magistrate Judge placed particular importance on the Federal Circuit's holding in *Retractable Technologies*. The invention at issue in *Retractable Technologies* was a tamperproof retractable syringe. The specification described "the invention" as having a one-piece body and criticized a prior art syringe that contained a two-piece body. *Retractable Technologies*, 653 F.3d at 1304. The Magistrate Judge cited *Retractable Technologies* for the proposition that the court

strives "to capture the scope of the actual invention, rather than strictly limit the scope of [the] claims to disclosed embodiments or allow the claim language to become divorced from what the specification conveys is the invention." *Id.* at 1305; A14. Specifically, the Magistrate Judge relied on *Retractable Technologies* for the proposition that, while the claims leave open the possibility that the element may be broader, the specification may limit it. A15. In the '896 patent, as in *Retractable Technologies*, all of the patent drawings depict a preferred embodiment. Unlike the '896 patent, however, the applicant in *Retractable Technologies* characterized "the invention," and not merely a preferred embodiment, as having a one-piece body. Moreover, the inventor in *Retractable Technologies* criticized prior art syringes that contained a two-piece body. Although some of the claims used the term "body" while others used the term "one piece body," the implication that the "body" claims were not limited to a one-piece body was not a strong one because of this criticism. *Retractable Technologies*, 653 F.3d at 1305.

The panel in *Retractable Technologies* limited the claims to a one-piece body based on the combination of these factors, several of which are utterly missing in the '896 patent. Although the '896 patent drawings depict certain preferred embodiments, these are merely illustrative, and do not encompass every aspect of "the invention." In *Retractable Technologies,* in contrast this narrower

scope is characterized as being "the invention." More important, the applicant in *Retractable Technologies* expressly criticized prior art syringes that contained a two-piece body. The '896 patent indulges in no such criticism of any alternative arrangement in which the "ledge" and "support surface" are transposed. Rather than limiting the "invention" to the preferred embodiments, Oda characterizes the '896 invention as including "alterations, modifications, and equivalent arrangements" that fall within the scope of the claims. A65, 4:9-12. Thus, although the narrower construction was compelled in *Retractable Technologies* "to tether the claims to what the specifications indicate the inventor actually invented," limiting the '896 patent claims as did the Magistrate Judge would instead "strictly limit the scope of [the] claims to disclosed embodiments." *See Retractable Technologies*, 653 F.3d at 1305.

Other Federal Circuit decisions also support the conclusion that the '896 patent claims cannot properly be limited to their preferred embodiments. *Teleflex*, 299 F.3d at 1327-28. Teleflex involved a clip for a shift cable. The patent in Teleflex disclosed a number of embodiments in which the clip has a single pair of legs. *Id.* at 1327. The district court relied on these multiple references to limit the claims. This Court disagreed and again "cautioned against limiting the claimed invention to preferred embodiments or specific examples in the specification." *Id.* at 1328. Although this error was harmless in *Teleflex*, it is dispositive here.

### 4. The Other Claims Inform the Meaning of the Terms "Support Surface" and "Ledge," Compelling that They Be Given Their Common, Ordinary Meanings

Equating the "support surface" with the "slide engagement track" and, more specifically, the "translation plane" fails to credit the language of the remaining claims and violates principles of claim differentiation. Claim 1 does not limit the "support surface" to being the same as the "slide engagement track" or a "translation plane." Claim 6 provides:

> 6. The self-ligating orthodontic bracket of claim 1, wherein the support surface intersects one of the opposing first and second slot surfaces to define an edge of the archwire slot and the support surface defines a translation plane that intersects the other of the opposing first and second slot surfaces.

A69, 11:1-5. Claim 6 further limits the support surface, namely, that it intersects a slot surface and defines a translation plane. These additional limitations imply that the "support surface" of claim 1 need not include these further limitations.

Although this presumption is rebuttable, the Magistrate Judge provided no reason for rejecting it here. Rather, the Magistrate Judge declined to address this issue. To construe "support surface" as did the Magistrate Judge would render superfluous the additional limitations of claim 6. The remaining claims of the '896 patent thus create a "strong presumption" that "support surface" is not limited in this way. *See, e.g.*, *Phillips*, 415 F.3d at 1315 ("[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation

in question is not present in the independent claims"); *Free Motion Fitness Inc. v. Cybex Int'l*, 423 F.3d 1343, 1351 (Fed. Cir. 2005) (the doctrine of claim differentiation emphasizes that the "difference in meaning and scope between claims is presumed to be significant to the extent that the absence of such difference in meaning and scope would make a claim superfluous"); *Liebel-Flarsheim Co.*, 358 F.3d at 910 (the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim).

> **5.** **Ormco Has Done Nothing to Disclaim or Disavow the Broad Meaning of the Terms "Support Surface" and "Ledge," Further Compelling that They Be Given Their Common, Ordinary Meanings**

The Magistrate Judge's narrow construction of "support surface" and "ledge" also runs afoul of this Court's consistent holding that it "will not limit broader claim language to [a] single application 'unless the patentee has demonstrated a *clear intention* to limit the claim scope *using words or expressions of manifest exclusion or restriction*.'" *Abbott Labs.*, 566 F.3d at 1288 (emphases added) (quoting *Liebel-Flarsheim*, 358 F.3d at 906) (internal quotation marks omitted). Similarly, "[a] patentee may limit the meaning of a claim term by making a *clear and unmistakable disavowal of scope* during prosecution." *Paragon Solutions, LLC v. Timex Corp.*, 566 F.3d 1075, 1085 (Fed. Cir. 2009) (emphasis added) (quoting *Cohesive Techs., Inc. v. Waters Corp.*, 543 F.3d 1351, 1361

(Fed. Cir. 2008)); *see also Omega Eng'g*, 334 F.3d at 1325-26 ("for prosecution disclaimer to attach, our precedent requires that the alleged disavowing actions or statements made during prosecution be both clear and unmistakable.").

In *Teleflex*, the Court did not find "a clear disavowal of claim scope" because the language of the asserted claim did not support limiting the "clip" to "a single pair of legs." Nor did the specification or prosecution history include "expression of manifest exclusion or restriction." *Teleflex,* 299 F.3d at 1327-28. "[A]lthough the specification [in *Teleflex*] describes only one embodiment of the clip, no 'clear statements of scope' limit the term 'clip' to having a 'single pair of legs.'" *Id.* Similarly, claim 1 does not limit the "support surface" to "a surface on the bracket body that defines a slide engagement track and therefore supports and guides the claimed movable member during movement between open and closed positions." Nor does it include "expression of manifest exclusion or restriction demonstrating an intent" to limit it.

The Magistrate Judge cited no evidence of a "clear intention" or "clear and unmistakable disavowal of scope." Indeed, there is none. WCT concedes as much by its silence on this issue. A1101. ("WCT does not argue that Ormco disclaimed or disavowed a broader interpretation of 'support surface' during prosecution"); A1077-94  (WCT did not rebut Ormco's argument). Nor is there anything in the prosecution history that satisfies this clear-and-unmistakable standard.

58

6. **The Magistrate Judge Erred by Allowing His Incorrect Construction of "Support Surface" to Determine the Construction of "Ledge"**

The Magistrate Judge made a comparable holding with respect to the term "ledge." A22 "[U]nder [WCT's] construction of 'support surface' the ledge is only in contact with the movable member when it is in the closed position." *Id*. Compelled by this incorrect construction of "support surface," the Magistrate Judge also erred in construing "ledge."

In sum, the plain English term "support surface" should be construed as a "surface that supports," consistent with its common, ordinary meaning and the claim limitations in the asserted claims that require it to engage the bracket only in the closed position. And "ledge" should be construed as a protrusion of the bracket body to inhibit the bracket from spontaneously opening.

VI. **CONCLUSION**

The terms "support surface" and "ledge" have common ordinary meanings, and are not limited to the functions described and illustrated in preferred embodiments of the invention. These limitations are not found in the asserted claims and cannot be imported into them from the specification.

The Magistrate Judge compounded his error by misapplying controlling precedent, misconstruing the article "the" as limiting in a "comprising" claim, and

placing undue emphasis of his subjective understanding of the invention based on the preferred embodiments. Ormco respectfully requests that this Court vacate the Magistrate Judge's claim construction and judgment of no infringement, and remand this case to the district court for further proceedings consistent with this Court's opinion.

Dated: February 12, 2014                    Respectfully submitted,


                                            __/s/Patrick J. Coyne_____
Gregory F. Ahrens                           Patrick J. Coyne
WOOD, HERRON & EVANS, L.L.P.                 FINNEGAN, HENDERSON, FARABOW,
441 Vine Street, 2700 Carew Tower              GARRETT & DUNNER, LLP
Cincinnati, OH 45202                         901 New York Avenue, NW
                                            Washington, DC 20001
                                            (202) 408-4000

                                            *Attorneys for Defendant-Appellant*
                                            *Ormco Corporation*

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing **BRIEF FOR ORMCO CORPORATION**

contains 12,719 words as measured by the word-processing software used to

prepare this brief.

Dated: February 12, 2014                    Respectfully submitted,


                                             _/s/Patrick J. Coyne_____

CASE PARTICIPANTS ONLY

# ADDENDUM

**Brenna K. Legaard**, OSB No. 001658
legaardb@lanepowell.com
**Peter D. Hawkes**, OSB No. 071986
hawkesp@lanepowell.com
**Jay R. Smith-Hill**, OSB No. 096079
smithhillj@lanepowell.com
**LANE POWELL** PC
601 SW Second Avenue, Suite 2100
Portland, Oregon  97204-3158
Telephone:  503.778.2165
Facsimile:  503.778.2200

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **WORLD CLASS TECHNOLOGY CORPORATION, an Oregon corporation,** | Case No. 3:13-cv-00401-AC |
| Plaintiff, | STIPULATED FINAL JUDGMENT |
| v. | |
| **ORMCO CORPORATION, a Delaware corporation,** | |
| Defendant. | |

Pursuant to the Stipulation and Joint Motion for Entry of Stipulated Final Judgment ("Stipulation"), the Court HEREBY ORDERS as follows:

1.    This a patent infringement case initiated by Plaintiff World Class Technology, Inc. ("WCT") as a declaratory judgment action against Defendant Ormco Corporation ("Ormco"). WCT sought a declaratory judgment that it did not infringe Ormco's U.S. Patent

Nos. 7,416,408, 7,267,545, 7,704,072, 7,909,603, and 8,033,824. Ormco filed a counterclaim alleging that WCT's H4 orthodontic bracket infringed Ormco's U.S. Patent No. 8,393,896 (" '896 patent").

2.    This Court has jurisdiction over the claims and counterclaim in this action pursuant to 28 U.S.C. §§ 1331, 1338, and 2202.

3.    On April 26, 2013, Ormco moved the Court for a preliminary injunction based on its counterclaim of infringement of the '896 patent. WCT opposed this motion.

4.    On August 9, 2013, the Court denied Ormco's preliminary injunction motion. In doing so, the Court preliminarily construed the claim term "support surface" in accordance with WCT's proposed construction, which was "a surface on the bracket body which at least partially supports and guides the movable member during movement between the open position and the closed position."

5.    On October 21, 2013, the Court issued its Claim Construction Opinion and Order. In that Opinion and Order, the Court issued its final construction of the term "support surface," which the Court interpreted to mean "a surface on the bracket body that defines the slide engagement track and therefore supports and guides the claimed movable member during movement between the open and closed positions." The Court also issued its final construction of the term "ledge," which the Court interpreted to mean "an area on the bracket body which contacts the claimed movable member only when the movable member is in the closed position."

6.    The accused H4 bracket has a movable member which slides over the archwire slot between open and closed positions. The movable member is positioned over the archwire slot when in the closed position. The H4 bracket body has a surface that includes a pair of opposed guides that define a slide engagement track, which supports and guides the H4 bracket's movable member as it moves between open and closed positions. That surface defines a translation plane along which the movable member moves between open and closed positions. That surface is parallel to the base surface of the archwire slot.

Case: 13-1679 Case: 3:13-PARTICIPANTS-ONLY Document: 21 Document: 75 Filed: 02/12/2014 Page 75 Page: 123 Filed: 02/12/2014

Case 3:13-cv-00401-AC    Document 71    Filed 11/12/13    Page 3 of 5    Page ID#: 1247

7.    All asserted claims of the '896 patent require a "support surface" which is acutely angled with respect to the base surface of the archwire slot.  As the Court has determined that a "support surface" is "a surface on the bracket body that defines the slide engagement track and therefore supports and guides the movable member during movement between open and closed positions," the H4 bracket does not have a "support surface," as construed by the Court, which is acutely angled with respect to the base surface, and therefore does not meet all of the limitations of any asserted claim.

8.    Under the Court's claim construction, Ormco cannot prevail on its counterclaim of infringement as to any of the asserted claims of the '896 patent directed to WCT's current H4 orthodontic bracket. Therefore, in view of the Court's Claim Construction Opinion and Order regarding the terms "support surface" and "ledge," the parties stipulate and agree to the entry of a stipulated judgment of non-infringement with regard to the application of the asserted claims of the '896 patent to WCT's current H4 orthodontic bracket.

9.    Ormco stipulates that WCT does not infringe any claim of Ormco's U.S. Patent Nos. 7,416,408, 7,267,545, 7,704,072, 7,909,603, and 8,033,824.

10.    All of WCT's un-adjudicated affirmative defenses are dismissed without prejudice. This dismissal without prejudice is made subject to the WCT's rights to reassert its un-adjudicated affirmative defenses should Ormco's infringement counterclaim regarding the '896 patent be revived for any reason (including, but not limited to, modification of the Court's claim construction on appeal).

11.    This Stipulated Final Judgment is without prejudice to Ormco's ability and right to appeal the Court's denial of Ormco's preliminary injunction motion and the Court's Claim Construction Opinion and Order. Moreover, if judgment is not affirmed on any appeal and this matter is remanded, the parties reserve all rights to assert and/or challenge the Court's claim construction and application of any or all of the claim limitations.

12.    This Stipulated Final Judgment is entered without prejudice to any rights the parties have post-judgment and/or the parties' rights to appeal any other aspect of the Court's ruling preceding the Stipulated Final Judgment, as well as any as future orders issued by the Court.

13.    Accordingly, the Court enters this Stipulated Final Judgment in favor of WCT on WCT's declaratory judgment claims of non-infringement and in favor of WCT on Ormco's counterclaim of infringement.    Ormco's counterclaim for infringement of the '896 patent is dismissed with prejudice.    WCT does not infringe any claim of any of US Patent Nos. 7,416,408, 7,267,545, 7,704,072, 7,909,603, 8,033,824, and 8,393,896.

DATED: _November 12_, 2013

_____
United States Magistrate Judge John V. Acosta

IT IS SO STIPULATED:

DATED: November 8, 2013

LANE POWELL PC

By _____

  Brenna K. Legaard, OSB No. 001658
  Peter D. Hawkes, OSB No. 071986
  Jay R. Smith-Hill, OSB No. 096079
  Telephone: 503.778.2100

Attorneys for Plaintiff

DATED: November 8, 2013

WOOD HERRON & EVANS, LLP

By _____

  Paul J. Linden (pro hac vice)
  Telephone: 513.241.2324

  Todd M. Siegel, OSB No. 001049
  Kristen P. Reichenbach, OSB No. 115858
  KLARQUIST SPARKMAN, LLP

121 SW Salmon Street, Suite 1600
Portland, OR 97204
Telephone: 503.595.5300

Christopher B. Mead (pro hac vice)
LONDON & MEAD
1225 19th Street, N.W.
Suite 320
Washington, D.C. 20036
Telephone: 202-331-3334

Gregory F. Ahrens (pro hac vice)
Paul J. Linden (pro hac vice)
Lisa M.A. Nolan (pro hac vice)
WOOD HERRON & EVANS, LLP
2700 Carew Tower
441 Vine Street
Cincinnati, OH 45202
Telephone: 513.241.2324

Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

WORLD CLASS TECHNOLOGY
CORPORATION, an Oregon corporation,

                  Plaintiff,

       v.

ORMCO CORPORATION, a Delaware
corporation,

                  Defendant.

_____

Civ. No. 3:13-cv-00401-AC

OPINION AND
ORDER

ACOSTA, Magistrate Judge:

*Introduction*

Presently before the court is the issue of claim construction of the language of United States

Patent No. 8,393,896 ("the '896 Patent"). The '896 Patent is the latest in a series of patents that

involve self-ligating orthodontic bracket technology. Self-ligating brackets differ from traditional

OPINION AND ORDER               1

brackets in that they permit attachment of the wire, known as the archwire, and the bracket without

the use of traditional ligatures, such as rubber bands or additional wires. Instead, the self-ligating

bracket features a slot with a sliding cover that permits an orthodontist to place the archwire in the

slot and to secure it in the slot by sliding the cover into the closed position. The '896 Patent

discloses an one such self-ligating bracket.

*Background*

Plaintiff World Class Technology Corporation ("WCT") seeks declaratory judgment of

noninfringement of five patents owned by Defendant Ormco Corporation ("Ormco"). Ormco asserts

a counterclaim of infringement of its U.S. Patent No. 8,393,896 ("the '896 Patent"), a sixth patent

now the subject of this litigation.

Ormco asserts that WCT's H4 bracket infringes claims 1, 2, 5, 7, 10, 14, and 15 of the '896

Patent. Claim 1 is an independent claim upon which claims 2-9 depend. Claim 10 is an independent

claim upon which claims 11-16 depend. The parties now request that the court construe the meaning

of two terms - "support surface" and "ledge."

*Legal Standard*

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to

which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312

(Fed. Cir. 2005) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d

1111, 1115 (Fed. Cir. 2004)). The analysis of a patent infringement action involves two steps: (1)

the proper construction of the asserted claim; and (2) a determination of whether the accused method

or product infringes the claims as properly construed. *Markman v. Westview Instruments, Inc.*, 52

F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd* 517 U.S. 370 (1996). "To ascertain the scope and

OPINION AND ORDER                                    2

meaning of the asserted claims, we look to the words of the claims themselves, the specification, the

prosecution history, and any relevant extrinsic evidence." *Retractable Techs., Inc. v. Becton,*

*Dickinson and Co.*, 653 F.3d 1296, (Fed. Cir. 2011) (citing *Phillips,* 415 F.3d at 1315-1317).

      In construing claim language, the words of a claim "are generally given their ordinary and

customary meaning[.]" *Vitronics Corp. v. Conceptronics, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

The ordinary and customary meaning of a claim term is the meaning that the term would have to a

person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective

filing date of the patent application. *Phillips*, 415 F.3d at 1313. "In some cases, the ordinary

meaning of claim language as understood by a person of skill in the art may be readily apparent even

to lay judges, and claim construction in such cases involves little more than the application of the

widely accepted meaning of commonly understood words." *Id.* at 1314.

      The court looks at the words of the claims themselves, both asserted and unasserted. *Id.*

"[T]he context in which a term is used in the asserted claim can be highly instructive." *Id.* For

example, the Federal Circuit has consistently held that interpreting a claim term in a manner that

renders subsequent claim language superfluous is improper. *See Stumbo v. Eastman Outdoors, Inc.*,

508 F.3d 1358, 1362 (Fed. Cir. 2007) (holding that a definition that renders claim language

superfluous is "a methodology of claim construction that this court has denounced"); *see also Merck*

*& Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that

gives meaning to all the terms of the claim is preferred over one that does not do so."). Similarly,

the doctrine of claim differentiation recites the principle that the limitations in each claim are

presumed to be distinct from one another. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898,

910 (Fed. Cir. 2004) (holding that the presence of a dependent claim that adds a particular limitation

OPINION AND ORDER         3

gives rise to a presumption that the limitation in question is not present in the independent claim).

However, the claims "do not stand alone[,]" *Phillips*, 415 F.3d at 1315, and "must be read in view of the specification, of which they are a part." *Markman*, 52 F.3d at 978. Accordingly, the specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582. The specification is especially important because "a patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history." *Id.* As such, "it is always necessary to review the specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning. The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication." *Id.*

Although the specification is relevant to claim construction, limitations found only in the specification are not to be read into the claims if the claim language is broader than the specification. *See Electro Med. Sys., S.A. v. Cooper Life Sci.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994) ("although the specifications may well indicate that certain embodiments are preferred, particular embodiments appearing in a specification will not be read into the claims when the claim language is broader than such embodiments"); *see also Teleflex, Inc. v. Ficosa N.A. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002) (refusing to import a limitation found in the specification even when the specification disclosed only one embodiment).

In addition to the specification, the court should consult the prosecution history of the patent, if in evidence. *Phillips*, 415 F.3d at 1317. Although typically less helpful than the specification, the prosecution history may demonstrate how the inventor understood the invention and whether the

OPINION AND ORDER                    4

inventor limited the scope of the invention during prosecution to avoid reading on prior art. *Id.*
"Under the doctrine of prosecution disclaimer, a patentee may limit the meaning of a claim term by
making a clear and unmistakable disavowal of scope during prosecution." *Purdue Pharma L.P. v.
Endo Pharma. Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006). "A patentee could do so, for example,
by clearly characterizing the invention in a way to try to overcome rejections based on prior art."
*Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374 (Fed. Cir. 2008). However,
"[p]rosecution disclaimer does not apply to an ambiguous disavowal." *Id.* at 1375.

Finally, if the ordinary and customary meaning of a claim term is not apparent from the
intrinsic evidence, courts are authorized to consult extrinsic evidence, which "consists of all evidence
external to the patent and prosecution history, including expert and inventor testimony, dictionaries,
and learned treatises." *Markman*, 52 F.3d at 980.

*Discussion*

I.     Claim Language

For convenience, the court sets for the language of the independent claims in their entirety.

Claim 1 of the '896 Patent reads:

> A self-ligating orthodontic bracket for coupling an archwire with a tooth,
> comprising:
>     a bracket body configured to be mounted to the tooth, the bracket body
> including *a support surface*, a ledge, and an archwire slot including a base surface
> and opposing first and second slot surfaces extending from the base surface, the base
> surface being interposed between the opposing first and second surfaces, *the support
> surface being acutely angled with respect to the base surface, and the ledge opposing
> the support surface across the archwire slot and including a surface that is generally
> parallel to the base surface*; and
>     a movable member coupled with the bracket body and movable between an
> opened position in which the archwire is insertable into the archwire slot and a closed
> position in which the movable member retains the archwire in the archwire slot,
>     wherein the movable member comprises a first portion and a second portion

extending at an acute angle from the first portion, *the first portion engaging the acutely angled support surface of the bracket body when the movable member is in the closed position*, the second portion being generally parallel to the base surface and extending across the archwire slot from the first slot surface to the second slot surface when the movable member is in the closed position.

('896 Patent 10:28-53 (emphasis added).)

Claim 10 of the '896 Patent reads:

A self-ligating orthodontic bracket for coupling an archwire with a tooth, comprising:

a bracket body configured to be mounted to the tooth, the bracket body including an archwire slot including a base surface and opposing first and second slot surfaces extending from the base surface, the base surface being interposed between the opposing first and second slot surfaces, a support surface being acutely angled with respect to the base surface, and a ledge opposing the support surface across the archwire slot and including a surface that is generally parallel fo the base surface; and

a movable member coupled with the bracket body and slidable from a closed position in which the movable member retains the archwire in the archwire slot toward an opened position in which the archwire is insertable into the archwire slot, the movable member comprising a first portion and a second portion extending at an acute angle from the first portion,

wherein the first portion engages the support surface in the closed position and the second portion is generally parallel to the base surface during sliding movement of the movable member from the closed position toward the opened position.

('896 Patent 11:21-43.)

The parties dispute the proper construction of "support surface" and "ledge."

A.    *Support Surface*

As the Federal Circuit directs, the court must first consider the words of the claims themselves. Ormco argues that the claim terms should be given their plain and ordinary meaning and, as such, the phrase "support surface" should be construed as "support surface," or "a surface

OPINION AND ORDER                6

that supports."[1]  Ormco objects to WCT's proposed construction for two primary reasons.  First, it contends that there is no support in the claim language for the requirement that the support surface guides the movable member between the open and closed positions and, therefore, this limitation is inappropriately imported from the specification.  Second, Ormco argues that principles of claim differentiation demonstrate that WCT's construction is incorrect.

WCT argues that the language of Claim 1 limits the meaning of "support surface" to a surface that is acutely angled with respect to the base surface of the archwire slot that also engages the slide, or "movable member," when it is in the closed position.  WCT proposes the following construction: "a surface on the bracket body which at least partially supports and guides the movable member during movement between the open position and the closed position."  WCT first cites the claim language, and argues that the claim language itself limits the meaning of "support surface" to a surface that is acutely angled to the base surface, lies across the archwire slot, and engages the first portion of the ligating slide, or movable member.

WCT also references unasserted claims and the "Summary of the Invention" in support of its construction of support surface.  Specifically, WCT argues that a person of ordinary skill in the art, having read Claims 3, 4, 6, and 10, would conclude that the support surface is analogous to the translation plane and, by extension, is also defined by the slide engagement track.  WCT also refers to Claims 23 and 26 as evidence that the support surface and the movable member are in contact as the it moves between the open and closed positions.

Claim 1 describes a bracket with an archwire slot, this slot having a base surface and two

---

[1] Ormco considers these constructions interchangeable.  *See* Ormco Opening Brief (#61) at n.3.

opposing surfaces such that the opposing surfaces extend out from the base surface.  ('869 Patent 10:31-34.)  The bracket also contains a support surface that is "acutely angled with respect to the base surface[.]"  ('896 Patent 10:35-37.)  The slide, or movable member, "engag[es] the acutely angled support surface" when the bracket is closed.  *Id.* at 10:45-49.  Claim 10 similarly refers to a bracket with an archwire slot, a base surface, two opposing surfaces, and "a support surface being acutely angled with respect to the base surface[.]"[2]  ('896 Patent 11:28-29.)  The first portion of a movable member, the movable member having two portions, engages with the support surface in the closed position.  ('896 Patent 11:39-40.)  This first portion extends at an acute angle from the second portion, which itself is generally parallel to the base surface.  Thus, the claim language alone makes clear that the critical characteristic of the support surface is that it is acutely angled.

B.     *Ledge*

Again, Ormco argues that the claim term "ledge" requires no construction and should be given its plain and ordinary meaning.  WCT offers the following proposed construction for "ledge": "An area on the bracket body which contacts the movable member only when the movable member is in the closed position."  The parties agree that the meaning of ledge depends on the meaning of support surface.

Ormco argues that WCT's construction imports limitations from the specification, namely that the ledge make contact with the movable member only when the movable member is in the closed position.  Rather, the claim language provides only that the ledge is a component of the bracket body and is located opposite the archwire slot from the support surface.  Ormco points out

_____

[2]The claim language also refers to "the support surface" rather than "a support surface," thus limiting the device to a single support surface.

OPINION AND ORDER     8

A013

that the language of Claim 2, which does limit the ledge to a portion of the bracket that is in contact with the movable member only in the closed position.  Thus, it contends, Claim 2 raises the presumption that language of Claim 1 contains no such limitation.

WCT argues that the ledge is defined by its orientation to the support surface in that it is across from the archwire slot, and the ledge is generally parallel to the base surface.  WCT also refers to Claim 2, which provides that the ledge and the movable member "cooperate" when the movable member is in the closed position.  And, in Claim 7, the movable member abuts the ledge when in the closed position.  WCT also refers to unasserted Claims 8 and 9 and their requirement that the ledge extend  past the movable member and act to receive the movable member as it moves into the closed position.

As the parties themselves argue, the construction of "ledge" is dependent on the construction given to "support surface."  If the court accepts Ormco's construction of "support surface" the ledge is merely any component of the bracket body located opposite the archwire slot from the support surface.  If the court accepts WCT's construction, the fact that the ledge is defined by virtue of its location relative to the support surface will further limit its meaning.

II.    The Specification

The court next considers the construction of "support surface" and "ledge" in light of the specification.  "In reviewing the intrinsic record to construe the claims, we strive to capture the scope of the actual invention, rather than strictly limit the scope of claims to disclosed embodiments or allow the claim language to become divorced from what the specification conveys is the invention." *Retractable Techs.*, 653 F.3d 1305.  The specification may resolve ambiguities present in the bare language of the claim.  For example, in *Retractable Technologies*, the court had to determine

whether the term "body" in the claim language was limited to a single-piece body, or could encompass a two-piece structure. The court evaluated both the claim language and the specification and concluded that the claimed device was limited to a single-piece structure: "In this case, while the claims leave open the possibility that the recited 'body' may encompass a syringe body composed of more than one piece, the specifications tell us otherwise." *Id.*

In *Gentry Gallery Inc. v. The Berkline Corp.*, 134 F.3d 1473 (Fed. Cir. 1998) ("*Gentry Gallery*"), the court reviewed a district court's claim construction. The device in question was a seating unit comprised of two reclining seats attached to and separated by a console, with the recliner controls located on the center console. The alleged infringer, Berkline, argued that the claim language did not encompass devices where the recliner controls were located somewhere other than the center console, because the patent only described such units with controls on the center console. The patentee, Gentry, argued that the unit with the controls on the center console was merely the preferred embodiment of the device, but that the claim language supported devices with the controls located elsewhere.

Gentry, the patentee, cited *Ethicon Endo-Surgery, Inc. v. United States Surgical Corp.*, 93 F.3d 1572 (Fed. Cir. 1993), for its proposition that an applicant is allowed claims beyond the scope of its preferred embodiment, so long as they remain within the bounds of the prior art. The court distinguished *Ethicon*, however, on the basis that, there, the "applicant 'was free to draft claims broadly (within the limits imposed by the prior art) to exclude the lockout's exact location as a limitation of the claimed invention' only because he 'did not consider the precise location of the lockout to be an element of his invention.'" *Gentry Gallery*, at 1479 (quoting *Ethicon*, 93 F.3d at 1582 n.7). In contrast, in the case before it, the inventor "considered the location of the recliner

OPINION AND ORDER                    10

controls on the console to be an essential element of his invention." *Gentry Gallery*, at 1479.  In a similar vein, the court noted that "'an applicant is entitled to claims as broad as the prior art *and his disclosure* will allow.'" *Id.* at 1480 (quoting *In re Rasmussen,* 650 F.2d 1212, 1214 (C.C.P.A.[3] 1981) (emphasis in original)).

The court agreed that the patent's disclosure[4] did not "support claims in which the location of the recliner controls [was] other than on the console." *Gentry Gallery*, 134 F.3d at 1479.  It acknowledged that "[i]t is a truism that a claim need not be limited to a preferred embodiment.  However, in a given case, the scope of the right to exclude may be limited by a narrow disclosure." *Id.*  In its view, the disclosure of the patented device contemplated "only the most minor variation in the location of the controls" and none outside of the console itself.  *Id.*  Additionally, the disclosure was explicit that the sole purpose of the console was to act as the location of the recliner controls.  *Id.*  As such, the court concluded that "locating the controls anywhere but on the console is outside the stated purpose of the invention."  *Id.*  The *Gentry* court concluded its discussion as follows:

> In sum, the cases on which Gentry relies do not stand for the proposition that an applicant can broaden his claims to the extent that they are effectively bounded only by the prior art.  Rather, they make clear that claims may be no broader than the supporting disclosure, and therefore that a narrow disclosure will limit claim breadth.

*Id.* at 1480.

_____

[3] The United States Court of Customs and Patent Appeals, or "CCPA," was a predecessor court to the Federal Circuit Court of Appeals. *Haggar Apparel Co. v. United States*, 222 F.3d 1337, 1339 (Fed. Cir. 2000).

[4] The disclosure refers to "everything revealed about an invention in the patent application, including drawings, descriptions, specifications, references to prior art, and claims." *Black's Law Dictionary* 532 (9th ed. 2009).

OPINION AND ORDER                  11

Both parties rely on *Phillips* to describe the importance of the specification in claim construction. In *Phillips*, the Federal Circuit discussed the role of the claim language and the disclosure as a whole in the process of claim construction. As an initial observation, the court wrote: "Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." 415 F.3d at 1313. The *Phillips* court stressed the importance of the specification in informing claim construction. In particular, "the specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id*. at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). The specification assists the court in determining the "meaning" of the patent:

> "Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction."

*Id*. at 1316 (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).

The *Phillips* court issued a caution as well, noting that although the specification is useful in construing ambiguous claims, it should not be used to justify reading limitations from the specification into the claim language. *See* 415 F.3d at 1323 ("Moreover, we recognize that the distinction between using the specification to interpret the meaning of claim and imposing limitations from the specification into the claim can be a difficult one to apply in practice."). This practice was deemed particularly risky where the patent contains a single embodiment, and the

Federal Circuit has "expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." *Id.* In *Phillips*, the Federal Circuit urged district courts construing claim language to "keep in mind that the purposes of the specification are to teach and enable those of skill in the art to make and use the invention and to provide the best mode for doing so. . . . The manner in which the patentee uses a term within the specification and claim usually will make the distinction apparent." *Id.*[5]

    A.    *Support Surface*

In Ormco's construction, a "support surface" may be any "surface that supports" the slide, or movable member, in the closed position that is also acutely angled to the base surface of the archwire slot. Ormco gives no guidance as to what constitutes support of the movable member, but presumably this refers to a surface that is in contact with the movable member when the bracket is in the closed position. Although Ormco acknowledges that the rest of the disclosure has relevance, it urges the court to focus its evaluation almost exclusively on the claim language. However, beyond arguing that a court may not import limitations from the specification into its construction of the claim language, Ormco is unable to substantiate its position with relevant case law. Rather, the cases cited by both parties are clear on this general point: the specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582.

---

    [5] As Ormco pointed out at hearing, the *Phillips* court ultimately sided with the patentee although the patentee's proposed construction was broader than the embodiments expressed in the specification, all of which showed a particular element of the device at an acute angle to the primary vertical orientation, whereas the invention claimed by the patentee included such element at right angle to the primary vertical orientation. Thus, although the specification was consulted to reach the appropriate construction of the element in question, the embodiments therein were not permitted to limit the claim language beyond its plain meaning.

WCT argues that having opted to use "support surface" rather than simply "surface," the inventor acted as his own lexicographer. Therefore, the meaning of support surface cannot be determined from viewing the claim language in isolation, and the court must turn to the specification. WCT cites the specification in support of its construction of "support surface." The specification identifies several deficiencies of the existing self-ligating orthodontic brackets, one of which is the tendency for the ligating slide to make contact with the gum tissue while in the open position. As such, the bracket described in the '896 Patent was designed with the aim that the slide would open and close on a "slide engagement track" that is angled such that the bracket opens away from the gum tissue. The relationship between the translation plane for the ligating slide and the base plane of the archwire slot, thus, gives meaning to the "acutely angled" limitation in the claim language.

After reviewing the patent in its entirety, including the claim language and the rest of the disclosure, the court observes the following. In the "Abstract" section of the patent, the inventor emphasized the angle of the movable member and how this enabled the bracket to avoid contact with the gum tissue while in the open position. The first sentence describes a bracket with a slide that moves along a translation plane, and the second sentence states only that the plane is "angled with respect to the base plane." ('896 Patent at 1.) The third sentence describes the slide as running parallel to the translation plane. In conclusion, the abstract states: "The translation plane is angled with respect to the base plane so as to prevent the ligating slide from contacting the gingiva surrounding the tooth when the ligating slide is moved to the open position." ('896 Patent at 1.)

In the "Background of the Invention" section of the patent, the inventor identifies three problems that the invention solves, each of which are unique to placing brackets on molars. These difficulties arise because of the position and location of the molars in the mouth and their

comparatively smaller size.  ('896 Patent at 2.)

The "Summary of the Invention" section of the patent repeatedly emphasizes the bracket's angled slide which avoids the gum tissue while in the open position.  It describes several aspects of the invention, the first being the translation plane acutely angled to the base plane "to prevent the ligating slide from contacting the gingiva surrounding the tooth when the ligating slide is moved to the opened position."  ('896 Patent 2:42-25.)  The summary next describes the relationship between the first and second portions of the slide which are designed to hold the archwire securely in the archwire slot by producing a "close fit."  ('896 Patent 2:45-52.)  The bracket surface is also designed to avoid occlusion with teeth on the opposite jaw and includes a "planar surface" that may be gripped with an orthodontic tool for purposes of applying the bracket to the tooth.  ('896 Patent 2:53-63.)  The bracket is also designed to prevent the slide from disengaging from the bracket body.  ('896 Patent 2:64-3:10.)

Importantly, the phrase "support surface" is used exclusively to reference the portion of the bracket upon which the ligating slide moves and rests, i.e., the translation plane.  The phrase "support surface" is not used in conjunction with any other part of the bracket.  For example, the specification refers to the translation plane and its angled relationship to the base plane, in order to avoid contact between the ligating slide and the gum tissue.  With respect to the angle used in a preferred embodiment, the specification reads:  "To prevent the ligating slide from contacting the gingiva, the base plane and translation plane have an angle . . . preferably approximately 20 degrees. The invention, however, is not so limited and, as recognized by those of ordinary skill in the art, other angles suitable for a particular application are possible."  ('896 Patent 5:65-6:23.)

The specification also describes the locking mechanism used to secure the ligating slide in

the closed position in the bracket. It reads: "A resilient engagement member operates to secure the ligating slide in the closed position. The resilient engagement member is generally L-shaped and includes a lingually-extending prong that is received in a recess formed in support surface." ('896 Patent 6:41-45.) The reference number identifies the support surface as the same surface described throughout the patent, namely the surface upon which the ligating slide moves and rests. This language reinforces the distinction between the support surface of the bracket, which is angled to prevent an open slide from contacting the gum tissue, and the portion of the slide that locks the slide in the closed position. The recess in which the locking mechanism engages is a recess in the support surface, and not the support surface itself. This directly refutes Ormco's argument that "support surface" refers to *any* bracket surface that "supports" because the recess in which the locking prong rests is something different than the support surface, i.e., the surface upon which the ligating slide moves and rests.

The mechanism regulating the movement of the slide is also addressed in the specification, and this mechanism is made up of a projecting and a receiving portion such that a "retaining pin" is inserted into a "slot." ('896 Patent 7:39-56.) "The retaining pin/slot configuration prevents accidental or unintentional detachment of the ligating slide from the bracket body during use when the ligating slide is positioned in the opened position. It should be realized that the retaining pin/slot configuration does not lock the ligating slide in any position . . . but regulates" its movement. ('896 Patent 7:56-63.) Again, no reference is made to the "support surface" or an acute angle.

The patent, viewed in the context of the specification, describes a device with several aspects and potential embodiments. It does not, however, describe a bracket that is merely characterized by a surface on the bracket, in contact with the ligating slide, that is at an acute angle to the base of the

OPINION AND ORDER                    16

archwire slot.  The invention in question is directed primarily at the problem of contact between the ligating slide and the patient's gum tissue.  Ormco's proposed construction does not capture the meaning of the patent and is both internally inconsistent with the claim language and contrary to the patent's disclosure as a whole.  With respect to "support surface," then, the claim language and the specification do not support the narrow construction urged by Ormco.

The court hereby adopts the construction of "support surface" proposed by WCT.

B.    *Ledge*

Having adopted WCT's construction of "support surface," it now considers the proper construction of "ledge" in light of the specification.  WCT reasons that, under its construction of "support surface," the ledge is only in contact with the movable member when it is in the closed position.  In light of the construction of "support surface" as the plane upon which the movable member opens and closes, it follows that the ledge is in contact with the movable member when it is in the closed position.  This is because the ledge lies across the archwire slot from the support surface.  This construction is further supported by the functionality of the ledge as described in the specification.

For these reasons, the court adopts WCT's construction of "ledge."

III.    Prosecution History

WCT also refers the court to the prosecution of the '896 Patent, arguing that it adds further credence to its proposed construction of "support surface."  According to WCT, in its "Amendment After Final Rejection," Ormco submitted an additional claim which is now Claim 6 of the issued '896 Patent.  (Smith-Hill Decl., Ex. B.)  The amendment was for the purpose of clarifying the meaning of "planar projection" and reads: "The self-ligating orthodontic bracket of claim 1, wherein

OPINION AND ORDER                    17

A022

the support surface intersects one of the opposing first and second slot surfaces to define an edge of the archwire slot and the support surface defines a translation plane that intersects the other of the opposing first and second slot surfaces." (*Id*. at 9.)  In the "Remarks" section of the amendment, Ormco stated that the "support surface and translation plane are disclosed in at least paragraph [0031] and depicted in Fig. 3." (*Id*. at 12.)

According to WCT, paragraph 31 refers to this portion of the issued patent:

> In another advantageous aspect of the invention, the slide engagement track and the archwire slot generally have a non-orthogonal relationship.  In particular, the base surface of the archwire generally defines a base plane and the slide engagement track generally defines a translation plane along which the ligating slide moves between the opened and closed positions.  It should be recognized that base surface and slide engagement track need not be precisely planar but be configured such that base plane and translation plane may be generally defined.  The base plane and translation plane are acutely angled with respect to each other by angle A, as shown in Fig. 3.  In this way, as the ligating slide is moved from the closed position to the opened position along slide engagement track and parallel to translation plane, the ligating slide moves generally in the labial-gingival direction so that the edge of the ligating slide does not make contact with the gingiva adjacent orthodontic bracket when mounted to molar teeth.

('896 Patent 5:65-6:23.)  WCT also notes that the sentences immediately prior to this paragraph refer to the support surface as defining the slide engagement track.  As such, WCT argues that the inventor's use of "support surface" in the claim language is consistent with its use in the specification, "as the surface which defines both the translation plane and the slide engagement track."  (Response at 14.)

Ormco responds that this argument is misplaced because it concerns the language of Claim 6, rather than the disputed language in Claim 1, and that the phrase "support surface" is never referenced in the prosecution history.  At hearing, however, Ormco argued that the language of Claim 6 and principles of claim differentiation lend support to its construction of "support surface"

OPINION AND ORDER                    18

because WCT's construction would render the language of Claim 6 superfluous. In its visual presentation at hearing, it cited the *Phillips* court: "[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." 415 F.3d at 1315 (citing *Liebel-Flarsheim*, 358 F.3d at 910). WCT was unable present argument to refute Ormco's argument, as the argument was presented for the first time at the hearing on this motion.

As a preliminary note, a presumption created under the doctrine of claim differentiation "will be overcome by a contrary construction dictated by the written description or prosecution history." *Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1369 (Fed. Cir. 2005). Furthermore, the court does not agree that WCT's construction of support surface would render the language of Claim 6 superfluous. Claim 6 reads: "The self-ligating orthodontic bracket of claim 1, wherein the support surface intersects one of the opposing first and second slot surfaces to define an edge of the archwire slot and the support surface defines a translation plane that intersects the other of the opposing first and second slot surfaces." ('896 Patent 11:1-5.) This claim describes a specific configuration of the archwire slot, the support surface, and the translation plane as defined by the support surface. Claim 6 provides that one edge of the archwire slot is defined by the support surface, which extends along the translation plane to intersect with the opposing edge of the archwire slot. Ormco's conclusory representations that Claim 6 describes the preferred embodiment or is otherwise superfluous are insufficient to disturb the court's construction of "support surface." With respect to WCT's contention that the prosecution history supports its proposed construction, the court declines to rule on this issue in light of its adoption of this construction based on the claim language and the specification.

OPINION AND ORDER                    19

A024

*Conclusion*

For the reasons stated, the court construes the claim language as follows. "Support surface" is construed as "a surface on the bracket body that defines a slide engagement track and therefore supports and guides the claimed movable member during movement between open and closed positions." "Ledge" is construed as "an area on the bracket body which contacts the claimed movable member only when the movable member is in the closed position."

IT IS SO ORDERED.

DATED this 21st day of October, 2013.

_____/s/ John V. Acosta_____
JOHN V. ACOSTA
United States Magistrate Judge

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

WORLD CLASS TECHNOLOGY
CORPORATION, an Oregon corporation,

                    Plaintiff,

        v.

ORMCO CORPORATION, a Delaware
corporation,

                    Defendant.

Civ. No. 3:13-cv-00401-AC

OPINION AND
ORDER

_____

ACOSTA, Magistrate Judge:

*Introduction*

    World Class Technology Corporation ("WCT") seeks declaratory judgment of

noninfringement of five patents owned by Ormco Corporation ("Ormco"). Ormco asserts a

counterclaim of infringement of its U.S. Patent No. 8,393,896 ("the '896 Patent"), a sixth patent now

the subject of this litigation. Relevant to the present motion, Ormco accuses WCT of marketing an

OPINION AND ORDER                1                 {KPR}

infringing product, the H4 bracket. Ormco now moves for a preliminary injunction to halt sales of the allegedly infringing H4 bracket. The court concludes that Ormco has not met its burden to establish a likelihood of success on the merits of its infringement claim. Accordingly, Ormco has failed to make the showing necessary to justify a preliminary injunction and the motion is denied.

*Background*

The '896 Patent is the latest in a series of patents that cover self-ligating orthodontic bracket technology. Self-ligating brackets differ from traditional brackets in that they permit attachment of the wire, known as the archwire, and the bracket without the use of traditional ligatures, such as rubber bands or additional wires. Instead, the self-ligating bracket features a slot with a sliding cover that permits an orthodontist to place the archwire in the slot and to secure it in the slot by sliding the cover into the closed position.

Ormco is well-established in the United States orthodontic market and possesses a loyal customer base and a positive reputation. Ormco owns several patents that feature self-ligating bracket technology and has developed a line of brackets known as the Damon brackets, named after inventor Dr. Dwight Damon. WCT, formerly a manufacturer of Ormco brackets, is now a competitor of Ormco and produces its own self-ligating bracket, the H4 bracket. According to WCT, the H4 bracket uses different manufacturing technology that gives it a competitive advantage over Ormco's brackets.

Ormco claims that two of its former employees, Dr. Thomas Pitts and Dr. Duncan Brown, have been instrumental in developing and promoting the H4 bracket, though neither doctor is currently employed by WCT. Ormco nonetheless attributes much of the harm it has allegedly suffered as a result of the H4 bracket to the activities of these two individuals. Ormco also alleges

collaboration between WCT and the doctors with regard to promotion of the H4 bracket and Ormco's proprietary information. According to Ormco, the H4 bracket's presence in the market has caused lost sales, price erosion, and damage to its customer relationships. Ormco does not currently market a product that embodies the technology covered by the '896 Patent.

*Legal Standard*

The Patent and Trademark Act specifically authorizes a preliminary injunction in a patent case to prevent infringement pending a ruling on the merits. 35 U.S.C. § 283 (2013). This inquiry is governed by Federal Circuit law. *Hybritech, Inc. v. Abbott Laboratories*, 849 F.2d 1446, 1451 n.12 (Fed. Cir. 1988). In the patent context, "[t]he four factors relevant to the district court's decision to grant or deny a preliminary injunction are[:] '(1) the likelihood of the patentee's success on the merits; (2) irreparable harm if the injunction is not granted; (3) the balance of hardships between the parties; and (4) the public interest.'" *Abbott Labs. v. Andrx Pharms., Inc.*, 473 F.3d 1196, 1200-1201 (Fed. Cir. 2007) (quoting *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1338-39 (Fed. Cir. 2003)). "Although the factors are not applied mechanically, a movant must establish the existence of both of the first two factors to be entitled to a preliminary injunction." *Altana Pharma AG v. Teva Pharms. USA, Inc.*, 566 F.3d 999, 1005 (Fed. Cir. 2009) (citing *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001)). Thus, "because 'a movant must establish both a likelihood of success on the merits and irreparable harm . . . the district court may deny a preliminary injunction based on the movant's failure to establish either [likelihood of success on the merits or irreparable harm] without making additional findings respecting the other factors.'" *Texas Instruments Inc. v. Tessera, Inc.*, 231 F.3d 1325, 1329 (Fed. Cir. 2000) (quoting *Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1556 (Fed. Cir. 1994)). Finally,

Case: 13-1679 Case: 13-1679 CASE PARTICIPANTS ONLY Document: 102 Page: 101 Filed: 02/12/2014 Page: 102 Filed: 02/12/2014

Case 3:13-cv-00401-AC    Document 63    Filed 08/09/13    Page 4 of 22    Page ID#: 1163

"[a] preliminary injunction is a 'drastic and extraordinary remedy that is not to be routinely granted.'" *National Steel Car, Ltd. v. Canadian Pacific Railway, Ltd.*, 357 F.3d 1319, 1324 (Fed. Cir. 2004) (quoting *Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1568 (Fed. Cir. 1993)).

*Discussion*

The parties' respective briefing and arguments make clear that the success of this motion turns on whether Ormco is likely to succeed on the merits of its infringement claim against WCT and, more specifically, the court's construction of "support surface." Ormco concedes that if the court adopts WCT's construction, its infringement claim will fail; WCT concedes that, under its own construction of "support surface," the patent is valid on all challenged grounds. It is well-established that "the patentee seeking a preliminary injunction in a patent infringement suit must show that it will likely prove infringement, *and* that it will likely withstand challenges, if any, to the validity of the patent." *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1376 (Fed. Cir. 2009) (emphasis added). Accordingly, upon a finding of noninfringement, the court need not examine validity.

I.    Infringement

A.    *Principles of Claim Construction*

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). The analysis of a patent infringement action involves two steps: (1) the proper construction of the asserted claim; and (2) a determination of whether the accused method or product infringes the claims as properly construed. *Markman v. Westview Instruments, Inc.*, 52

F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd* 517 U.S. 370 (1996). "To ascertain the scope and meaning of the asserted claims, we look to the words of the claims themselves, the specification, the prosecution history, and any relevant extrinsic evidence." *Retractable Technologies, Inc. v. Becton, Dickinson and Co.*, 653 F.3d 1296, (Fed. Cir. 2011) (citing *Phillips,* 415 F.3d at 1315-1317).

In construing claim language, the words of a claim "are generally given their ordinary and customary meaning[.]" *Vitronics Corp. v. Conceptronics, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). The ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application. *Phillips*, 415 F.3d at 1313. "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314.

The court looks at the words of the claims themselves, both asserted and unasserted. *Id.* "[T]he context in which a term is used in the asserted claim can be highly instructive." *Id*. For example, the Federal Circuit has consistently held that interpreting a claim term in a manner that renders subsequent claim language superfluous is improper. *See Stumbo v. Eastman Outdoors, Inc.*, 508 F.3d 1358, 1362 (Fed. Cir. 2007) (holding that a definition that renders claim language superfluous is "a methodology of claim construction that this court has denounced"); *see also Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so."). Similarly, the doctrine of claim differentiation recites the principle that the limitations in each claim are presumed to be distinct from one another. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898,

910 (Fed. Cir. 2004) (holding that the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim).

However, the claims "do not stand alone[,]" *Phillips*, 415 F.3d at 1315, and "must be read in view of the specification, of which they are a part." *Markman*, 52 F.3d at 978. Accordingly, the specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582. The specification is especially important because "a patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history." *Id.* As such, "it is always necessary to review the specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning. The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication." *Id.*

Although the specification is relevant to claim construction, limitations found only in the specification are not to be read into the claims if the claim language is broader than the specification. *See Electro Medical Sys., S.A. v. Cooper Life Sciences*, 34 F.3d 1048, 1054 (Fed. Cir. 1994) ("although the specifications may well indicate that certain embodiments are preferred, particular embodiments appearing in a specification will not be read into the claims when the claim language is broader than such embodiments"); *see also Teleflex, Inc. v. Ficosa N.A. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002) (refusing to import a limitation found in the specification even when the specification disclosed only one embodiment).

In addition to the specification, the court should consult the prosecution history of the patent, if in evidence. *Phillips*, 415 F.3d at 1317. Although typically less helpful than the specification,

the prosecution history may demonstrate how the inventor understood the invention and whether the inventor limited the scope of the invention during prosecution to avoid reading on prior art. *Id.* "Under the doctrine of prosecution disclaimer, a patentee may limit the meaning of a claim term by making a clear and unmistakable disavowal of scope during prosecution." *Purdue Pharma L.P. v. Endo Pharmaceuticals Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006). "A patentee could do so, for example, by clearly characterizing the invention in a way to try to overcome rejections based on prior art." *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374 (Fed. Cir. 2008). However, "[p]rosecution disclaimer does not apply to an ambiguous disavowal." *Id.* at 1375.

Finally, if the ordinary and customary meaning of a claim term is not apparent from the intrinsic evidence, courts are authorized to consult extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980.

The court's findings of fact and conclusions of law made at the preliminary injunction stage are not binding in subsequent proceedings, and claims may be provisionally construed for purposes of deciding the motion. *Outside the Box Innovations, LLC v. Travel Caddy, Inc.*, 695 F.3d 1285, 1302 (Fed. Cir. 2012). This is referred to as "rolling claim construction." *Id.*

B.    Application

Ormco contends that it is likely to prevail on its claim that WCT's H4 brackets infringe several claims of Ormco's '896 Patent, specifically Claims 1, 2, 5, and 7. WCT argues that multiple claim limitations in the '896 Patent are not met, focusing specifically on the "support surface" limitation to illustrate this assertion.

Claim 1 of the '896 Patent reads:

A self-ligating orthodontic bracket for coupling an archwire with a tooth, comprising:

a bracket body configured to be mounted to the tooth, the bracket body including *a support surface*, a ledge, and an archwire slot including a base surface and opposing first and second slot surfaces extending from the base surface, the base surface being interposed between the opposing first and second surfaces, *the support surface being acutely angled with respect to the base surface, and the ledge opposing the support surface across the archwire slot and including a surface that is generally parallel to the base surface*; and

a movable member coupled with the bracket body and movable between an opened position in which the archwire is insertable into the archwire slot and a closed position in which the movable member retains the archwire in the archwire slot,

wherein the movable member comprises a first portion and a second portion extending at an acute angle from the first portion, *the first portion engaging the acutely angled support surface of the bracket body when the movable member is in the closed position*, the second portion being generally parallel to the base surface and extending across the archwire slot from the first slot surface to the second slot surface when the movable member is in the closed position.

('896 Patent 10:28-53 (emphasis added).) The parties dispute the proper construction of "support surface."

      1.    <u>Claim Language</u>

As the Federal Circuit directs, the court must first consider the words of the claims themselves. Ormco argues that the claim terms should be given their plain and ordinary meaning and, as such, the phrase "support surface" should be construed as "a surface that supports." In support of its allegation of infringement, Ormco refers the court to the declaration of Dr. Roger W. Toogood ("Dr. Toogood"). Dr. Toogood has forty years of experience in mechanical engineering and has spent seven years focused on orthodontics. (Toogood Declaration ("Decl.") ¶ 5.) Attached to the declaration is a "claim chart" in support of Dr. Toogood's "opinion that the H4 bracket literally infringes claims 1, 2, 5, and 7 of the '896 patent." *Id*. at ¶ 9.

Dr. Toogood's claim chart is a simple chart with two columns. The first contains the

language of the disputed claims and the second identifies the portions of the H4 bracket that meet that particular limitation. This second column chiefly refers the court to six pages of "bracket specs" that contain diagrams of the H4 bracket as well as promotional materials detailing the bracket specifications. With respect to the claim language "support surface," the chart refers exclusively to "Sheet 6" which is a depiction of a portion of the H4 bracket in cross-section. This portion includes the archwire slot and the body of the bracket. Dr. Toogood identifies a surface that, functionally, provides the locking mechanism for the ligating slide. Although the surface appears to be somewhat curved in the diagram, Dr. Toogood draws a line that is either flush with, or potentially merely tangential to, this surface. Extending this line to the line formed by the plane of the base of the archwire slot creates an acute angle. In the same diagram, Dr. Toogood identifies another support surface – suggesting that there may be multiple surfaces rather than a singular support surface – that is adjacent to the lip of the bracket that performs the locking function. This surface makes contact with the front end of the ligating slide after it has locked into place in the closed position.

WCT argues that the language of Claim 1 limits the meaning of "support surface" to surfaces acutely angled with respect to the base surface of the archwire slot that also engage the slide, or "movable member," when it is in the closed position. WCT proposes the following construction: "a surface on the bracket body which at least partially supports and guides the movable member during movement between the open position and the closed position." WCT first cites the claim language, and argues that the claim language itself limits the meaning of "support surface" to a surface that is acutely angled to the base surface, that lies across the archwire slot, and that engages the first portion of the ligating slide, or movable member.

Claim 1 describes a bracket with an archwire slot, this slot having a base surface and two opposing surfaces such that the opposing surfaces extend out from the base surface. ('869 Patent 10:31-34.)  The bracket also contains a support surface that is "acutely angled with respect to the base surface[.]"  *Id*. at '869 Patent 10:35-37.  The slide, or movable member, "engag[es] the acutely angled support surface" when the bracket is closed.  *Id*. at 10:45-49.  Thus, the claim language alone makes clear that the critical characteristic of the support surface is that it is acutely angled.  The claim language also refers to "the support surface" rather than "a support surface," thus limiting the device to a single support surface.

Ormco's motion carries with it the burden to establish that is it likely to prevail on its infringement claim.  Its reliance on Dr. Toogood's conclusory and unexplained chart is not sufficient to meet the high burden necessary to justify a preliminary injunction.  First, the surfaces identified by Ormco as the support surfaces are both associated with the locking mechanism.  As WCT argued at hearing, the angled relationship between those surfaces and the base of the archwire slot is not intrinsic to their functionality.   Second, that Ormco identified multiple support surfaces runs contrary to the claim language that refers to a singular surface, "the support surface."  Third, the identified surfaces on the H4 bracket are not clearly defined and, in certain of the provided diagrams, appear curved or arbitrarily highlighted.  In light of Ormco's burden at this stage to establish a likelihood of success on its infringement claim, the court is unpersuaded that the claim language, even when viewed in isolation, should be given the broad construction Ormco urges.

### 2.    The Specification

The court must next consider the construction of "support surface" in light of the specification.  "In reviewing the intrinsic record to construe the claims, we strive to capture the

scope of the actual invention, rather than strictly limit the scope of claims to disclosed embodiments or allow the claim language to become divorced from what the specification conveys is the invention." *Retractable Technologies*, 653 F.3d 1305. The specification may resolve ambiguities present in the bare language of the claim. For example, in *Retractable Technologies*, the court had to determine whether the term "body" in the claim language was limited to a single-piece body, or could encompass a two-piece structure. The court evaluated both the claim language and the specification and concluded that the claimed device was limited to a single-piece structure: "In this case, while the claims leave open the possibility that the recited 'body' may encompass a syringe body composed of more than one piece, the specifications tell us otherwise." *Id.*

WCT cites *Gentry Gallery, Inc. v. The Berkline Corp.*, 134 F.3d 1473 (Fed. Cir. 1998) ("*Gentry Gallery*") in support of its proposed construction. In *Gentry Gallery*, the court reviewed a district court's claim construction. The device in question was a seating unit comprised of two reclining seats attached to and separated by a console, with the recliner controls located on the center console. The alleged infringer, Berkline, argued that the claim language did not encompass devices where the recliner controls were located somewhere other than the center console, because the patent only described such units with controls on the center console. The patentee, Gentry, argued that the unit with the controls on the center console was merely the preferred embodiment of the device, but that the claim language supported devices with the controls located elsewhere.

Gentry, the patentee, cited *Ethicon Endo-Surgery, Inc. v. United States Surgical Corp.*, 93 F.3d 1572 (Fed. Cir. 1993), for its proposition that an applicant is allowed claims beyond the scope of its preferred embodiment, so long as they remain within the bounds of the prior art. The court distinguished *Ethicon*, however, on the basis that, there, the "applicant 'was free to draft claims

OPINION AND ORDER                          11                                  {KPR}

broadly (within the limits imposed by the prior art) to exclude the lockout's exact location as a limitation of the claimed invention' only because he 'did not consider the precise location of the lockout to be an element of his invention.'" *Gentry Gallery*, at 1479 (quoting *Ethicon*, 93 F.3d at 1582 n.7).  In contrast, in the case before it, the inventor "considered the location of the recliner controls on the console to be an essential element of his invention." *Gentry Gallery*, at 1479.  In a similar vein, the court noted that "'an applicant is entitled to claims as broad as the prior art *and his disclosure* will allow.'" *Id.* at 1480 (quoting *In re Rasmussen,* 650 F.2d 1212, 1214 (C.C.P.A.[1] 1981) (emphasis in original)).

The court agreed that the patent's disclosure[2] did not "support claims in which the location of the recliner controls [was] other than on the console." *Gentry Gallery*, 134 F.3d at 1479.  It acknowledged that "[i]t is a truism that a claim need not be limited to a preferred embodiment.  However, in a given case, the scope of the right to exclude may be limited by a narrow disclosure." *Id*.  In its view, the disclosure of the patented device contemplated "only the most minor variation in the location of the controls" and none outside of the console itself.  *Id*.  Additionally, the disclosure was explicit that the sole purpose of the console was to act as the location of the recliner controls.  *Id*.  As such, the court concluded that "locating the controls anywhere but on the console is outside the stated purpose of the invention."  *Id*.  The *Gentry* court concluded its discussion as follows:

---

[1] The United States Court of Customs and Patent Appeals, or "CCPA," was a predecessor court to the Federal Circuit Court of Appeals. *Haggar Apparel Co. v. United States*, 222 F.3d 1337, 1339 (Fed. Cir. 2000).

[2] The disclosure refers to "everything revealed about an invention in the patent application, including drawings, descriptions, specifications, references to prior art, and claims." *Black's Law Dictionary* 532 (9th ed. 2009).

> In sum, the cases on which Gentry relies do not stand for the proposition that an
> applicant can broaden his claims to the extent that they are effectively bounded only
> by the prior art. Rather, they make clear that claims may be no broader than the
> supporting disclosure, and therefore that a narrow disclosure will limit claim breadth.

*Id*. at 1480.

WCT also relies on *Phillips* in arguing that the specification must be consulted. In *Phillips*,

the Federal Circuit discussed the role of the claim language and the disclosure as a whole in the

process of claim construction. As an initial observation, the court wrote: "Importantly, the person

of ordinary skill in the art is deemed to read the claim term not only in the context of the particular

claim in which the disputed term appears, but in the context of the entire patent, including the

specification." 415 F.3d at 1313. The *Phillips* court stressed the importance of the specification in

informing claim construction. In particular, "the specification 'is always highly relevant to the claim

construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a

disputed term.'" *Id*. at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582

(Fed. Cir. 1996)). The specification assists the court in determining the "meaning" of the patent:

> "Ultimately, the interpretation to be given a term can only be determined and
> confirmed with a full understanding of what the inventors actually invented and
> intended to envelop with the claim. The construction that stays true to the claim
> language and most naturally aligns with the patent's description of the invention will
> be, in the end, the correct construction."

*Id*. at 1316 (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir.

1998)).

The *Phillips* court issued a caution as well, noting that although the specification is useful

in construing ambiguous claims, it should not be used to justify reading limitations from the

specification into the claim language. *See* 415 F.3d at 1323 ("Moreover, we recognize that the

distinction between using the specification to interpret the meaning of claim and imposing

limitations from the specification into the claim can be a difficult one to apply in practice.").  This practice was deemed particularly risky where the patent contains a single embodiment, and the Federal Circuit has "expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment."  *Id*. In *Phillips*, the Federal Circuit urged district courts construing claim language to "keep in mind that the purposes of the specification are to teach and enable those of skill in the art to make and use the invention and to provide the best mode for doing so. . . .  The manner in which the patentee uses a term within the specification and claim usually will make the distinction apparent."  *Id*.[3]

In Ormco's construction, a "support surface" may be any "surface that supports" the slide, or movable member, in the closed position that is also acutely angled to the base surface of the archwire slot.  Ormco gives no guidance as to what constitutes support of the movable member, but presumably this refers to a surface that is in contact with the movable member when the bracket is in the closed position.  Although Ormco acknowledges that the rest of the disclosure has relevance, it urges the court to focus its evaluation almost exclusively on the claim language.  However, beyond arguing that a court may not import limitations from the specification into its construction of the claim language, Ormco is unable to substantiate its position with relevant case law.  Rather, the cases cited by both parties are clear on this general point:  the specification "is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to

---

[3] As Ormco pointed out at hearing, the *Phillips* court ultimately sided with the patentee although the patentee's proposed construction was broader than the embodiments expressed in the specification, all of which showed a particular element of the device at an acute angle to the primary vertical orientation, whereas the invention claimed by the patentee included such element at right angle to the primary vertical orientation.  Thus, although the specification was consulted to reach the appropriate construction of the element in question, the embodiments therein were not permitted to limit the claim language beyond its plain meaning.

the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582.

WCT cites the specification in support of its construction of "support surface." The specification identifies several deficiencies of the existing self-ligating orthodontic brackets, one of which is the tendency for the ligating slide to make contact with the gum tissue while in the open position. As such, the bracket described in the '896 Patent was designed with the aim that the slide would open and close on a "slide engagement track" that is angled such that the bracket opens away from the gum tissue. The relationship between the translation plane for the ligating slide and the base plane of the archwire slot, thus, gives meaning to the "acutely angled" limitation in the claim language. WCT next cites an embodiment described in the specification which describes the support surface as defining the slide engagement track, and cites the advantage of an angled relationship between the slide engagement track and the base surface of the archwire slot.

After reviewing the patent in its entirety, including the claim language and the rest of the disclosure, the court observes the following. In the "Abstract" section of the patent, the inventor emphasized the angle of the movable member and how this enabled the bracket to avoid contact with the gum tissue while in the open position. The first sentence describes a bracket with a slide that moves along a translation plane, and the second sentence states only that the plane is "angled with respect to the base plane." ('896 Patent at 1.) The third sentence describes the slide as running parallel to the translation plane. In conclusion, the abstract states: "The translation plane is angled with respect to the base plane so as to prevent the ligating slide from contacting the gingiva surrounding the tooth when the ligating slide is moved to the open position." ('896 Patent at 1.)

In the "Background of the Invention" section of the patent, the inventor identifies three problems that the invention solves, each of which are unique to placing brackets on molars. These

OPINION AND ORDER                             15                                    {KPR}

difficulties arise because of the position and location of the molars in the mouth and their comparatively smaller size. ('896 Patent at 2.) This section of the patent in no way addresses or even alludes to a mechanism for locking or securing the slide when in the closed position, for molars or any other teeth.

The "Summary of the Invention" section of the patent repeatedly emphasizes the bracket's angled slide which avoids the gum tissue while in the open position. It describes several aspects of the invention, the first being the translation plane acutely angled to the base plane "to prevent the ligating slide from contacting the gingiva surrounding the tooth when the ligating slide is moved to the opened position." ('896 Patent 2:42-25.) The summary next describes the relationship between the first and second portions of the slide which are designed to hold the archwire securely in the archwire slot by producing a "close fit." ('896 Patent 2:45-52.) The bracket surface is also designed to avoid occlusion with teeth on the opposite jaw and includes a "planar surface" that may be gripped with an orthodontic tool for purposes of applying the bracket to the tooth. ('896 Patent 2:53-63.) The bracket is also designed to prevent the slide from disengaging from the bracket body. ('896 Patent 2:64-3:10.)

Importantly, the phrase "support surface" is used exclusively to reference the portion of the bracket upon which the ligating slide moves and rests, i.e., the translation plane. The phrase "support surface" is not used in conjunction with any other part of the bracket and, thus, is not contemplated as a reference to a portion of the locking mechanism on the leading end of the slide. For example, the specification refers to the translation plane and its angled relationship to the base plane, in order to avoid contact between the ligating slide and the gum tissue. With respect to the angle used in a preferred embodiment, the specification reads: "To prevent the ligating slide from

contacting the gingiva, the base plane and translation plane have an angle . . . preferably approximately 20 degrees. The invention, however, is not so limited and, as recognized by those of ordinary skill in the art, other angles suitable for a particular application are possible." ('896 Patent 5:65-6:23.)

The specification also describes the locking mechanism used to secure the ligating slide in the closed position in the bracket. It reads: "A resilient engagement member operates to secure the ligating slide in the closed position. The resilient engagement member is generally L-shaped and includes a lingually-extending prong that is received in a recess formed in support surface." ('896 Patent 6:41-45.) The reference number identifies the support surface as the same surface described throughout the patent, namely the surface upon which the ligating slide moves and rests. This language reinforces the distinction between the support surface of the bracket, which is angled to prevent an open slide from contacting the gum tissue, and the portion of the slide that locks the slide in the closed position. The recess in which the locking mechanism engages is a recess in the support surface, and not the support surface itself. This directly refutes Ormco's argument that "support surface" refers to *any* bracket surface that "supports" because the recess in which the locking prong rests is something different than the support surface, i.e., the surface upon which the ligating slide moves and rests.

The mechanism regulating the movement of the slide is also addressed in the specification, and this mechanism is made up of a projecting and a receiving portion such that a "retaining pin" is inserted into a "slot." ('896 Patent 7:39-56.) "The retaining pin/slot configuration prevents accidental or unintentional detachment of the ligating slide from the bracket body during use when the ligating slide is positioned in the opened position. It should be realized that the retaining pin/slot

OPINION AND ORDER                                    17                                    {KPR}

configuration does not lock the ligating slide in any position . . . but regulates" its movement. ('896 Patent 7:56-63.)  Again, no reference is made to the "support surface" or an acute angle.

The patent, viewed in the context of the specification, describes a device with several aspects and potential embodiments.  It does not, however, describe a bracket that is merely characterized by a surface on the bracket, in contact with the ligating slide, that is at an acute angle to the base of the archwire slot.  It similarly does not evidence an intent to encompass a bracket where this surface acts to secure the ligating slide in the closed position.  The invention in question is directed primarily at the problem of contact between the ligating slide and the patient's gum tissue.  Ormco's proposed construction does not capture the meaning of the patent and is both internally inconsistent with the claim language and contrary to the patent's disclosure as a whole.  With respect to "support surface," then, the claim language and the specification do not support the narrow construction urged by Ormco.

The court hereby adopts, at this stage, the construction proposed by WCT.  Under this construction, the H4 bracket clearly does not meet every limitation of Claim 1 of the '896 Patent, most notably the requirement that the support surface be acutely angled to the base of the archwire slot.  The remaining claims asserted by Ormco, Claims 2, 5, and 7, are dependent on Claim 1 and, therefore, Ormco has similarly failed to establish a likelihood of success on the merits of its allegation of infringement of those claims.  *See Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1552 (Fed. Cir. 1989) ("One who does not infringe an independent claim cannot infringe a claim dependent on (and thus containing all the limitations of) that claim." (citation omitted)).  Ormco cannot establish a likelihood of the success on the merits of its infringement claim, and its motion is denied.

3.     Prosecution History

WCT also refers the court to the prosecution of the '896 Patent, arguing that it adds further credence to its proposed construction of "support surface." According to WCT, in its "Amendment After Final Rejection," Ormco submitted an additional claim which is now Claim 6 of the issued '896 Patent. (Smith-Hill Decl., Ex. B.) The amendment was for the purpose of clarifying the meaning of "planar projection" and reads: "The self-ligating orthodontic bracket of claim 1, wherein the support surface intersects one of the opposing first and second slot surfaces to define an edge of the archwire slot and the support surface defines a translation plane that intersects the other of the opposing first and second slot surfaces." (*Id*. at 9.) In the "Remarks" section of the amendment, Ormco stated that the "support surface and translation plane are disclosed in at least paragraph [0031] and depicted in Fig. 3." (*Id*. at 12.)

According to WCT, paragraph 31 refers to this portion of the issued patent:

> In another advantageous aspect of the invention, the slide engagement track and the archwire slot generally have a non-orthogonal relationship. In particular, the base surface of the archwire generally defines a base plane and the slide engagement track generally defines a translation plane along which the ligating slide moves between the opened and closed positions. It should be recognized that base surface and slide engagement track need not be precisely planar but be configured such that base plane and translation plane may be generally defined. The base plane and translation plane are acutely angled with respect to each other by angle A, as shown in Fig. 3. In this way, as the ligating slide is moved from the closed position to the opened position along slide engagement track and parallel to translation plane, the ligating slide moves generally in the labial-gingival direction so that the edge of the ligating slide does not make contact with the gingiva adjacent orthodontic bracket when mounted to molar teeth.

('896 Patent 5:65-6:23.) WCT also notes that the sentences immediately prior to this paragraph refer to the support surface as defining the slide engagement track. As such, WCT argues that the inventor's use of "support surface" in the claim language is consistent with its use in the

specification, "as the surface which defines both the translation plane and the slide engagement track." (Response at 14.)

Ormco responds that this argument is misplaced because it concerns the language of Claim 6, rather than the disputed language in Claim 1, and that the phrase "support surface" is never referenced in the prosecution history. At hearing, however, Ormco argued that the language of Claim 6 and principles of claim differentiation lend support to its construction of "support surface" because WCT's construction would render the language of Claim 6 superfluous. In its visual presentation at hearing, it cited the *Phillips* court: "[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." 415 F.3d at 1315 (citing *Liebel-Flarsheim*, 358 F.3d at 910). WCT was unable present argument to refute Ormco's argument, as the argument was presented for the first time at the hearing on this motion.

As a preliminary note, a presumption created under the doctrine of claim differentiation "will be overcome by a contrary construction dictated by the written description or prosecution history." *Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1369 (Fed. Cir. 2005)). Furthermore, the court does not agree that WCT's construction of support surface would render the language of Claim 6 superfluous. Claim 6 reads: "The self-ligating orthodontic bracket of claim 1, wherein the support surface intersects one of the opposing first and second slot surfaces to define an edge of the archwire slot and the support surface defines a translation plane that intersects the other of the opposing first and second slot surfaces." ('896 Patent 11:1-5.) This claim describes a specific configuration of the archwire slot, the support surface, and the translation plane as defined by the support surface. Claim 6 provides that one edge of the archwire slot is defined by the support surface, which extends

along the translation plane to intersect with the opposing edge of the archwire slot. Ormco's conclusory representations that Claim 6 describes the preferred embodiment or is otherwise superfluous are insufficient to disturb the court's construction of "support surface." With respect to WCT's contention that the prosecution history supports its proposed construction, the court declines to rule on this issue in light of its adoption of this construction based on the claim language and the specification.

II.    Validity

Upon the court's adoption of WCT's construction of "support surface," the issue of validity becomes moot. WCT has implicitly conceded that the '896 Patent remains valid under its construction. *See Response* (#47) at 20 (citing its own construction of "support surface," WCT writes "[s]o long as 'support surface' is construed to refer to that surface, the claim is adequately enabled and described by the specification."); *see also Response* (#47) at 22 ("Note that WCT does not argue that the following references enable the '896 patent *as properly construed* in the context of the teaching of the patent's specification." (emphasis in original)). It follows that, having adopted WCT's construction, the invalidity issues are no longer in dispute on this motion.

III.    Other Factors

As stated above, the court need not analyze the remaining factors where the patentee fails to show a likelihood of success on the merits of its infringement claim. This approach is routinely followed by district courts, and this court sees no reason to further weigh the impacts of lawful, non-infringing conduct. *See Maxwell Techs., Inc. v. Nesscap, Inc.*, 508 F. Supp. 2d 837, 849 ("Because the Court has found that Plaintiff has not met its burden of showing likelihood of success on the merits regarding infringement by the accused products, it need not address any other preliminary

injunction factor." (citing *Reebok Int'l*, 32 F.3d at 1556)); *see MMJK, Inc. v. Ultimate Blackjack Tour LLC*, 513 F. Supp. 2d 1150, 1153 (N.D. Cal. 2007) ("In other words, if defendant 'raises a substantial question concerning either infringement or validity, i.e., asserts an infringement or invalidity defense that the [plaintiff] cannot prove "lacks substantial merit," the preliminary injunction should not issue.'" (quoting *Amazon.com, Inc.*, 239 F.3d at 1350-1351)).

## Conclusion

Ormco cannot establish a likelihood of success on the merits of its infringement claim and, therefore, its Motion for Preliminary Injunction (#36) is DENIED.

IT IS SO ORDERED.

DATED this 9th day of August, 2013.

> _____/s/ John V. Acosta_____
> JOHN V. ACOSTA
> United States Magistrate Judge



US008393896B2

(12) **United States Patent**
Oda

(10) Patent No.: **US 8,393,896 B2**
(45) Date of Patent: **Mar. 12, 2013**

(54) **SELF-LIGATING ORTHODONTIC BRACKET**

(75) Inventor: **Todd I. Oda**, Torrance, CA (US)

(73) Assignee: **Ormco Corporation**, Orange, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **13/052,759**

(22) Filed: **Mar. 21, 2011**

(65) **Prior Publication Data**

US 2011/0195372 A1      Aug. 11, 2011

**Related U.S. Application Data**

(63) Continuation of application No. 11/837,169, filed on Aug. 10, 2007, now Pat. No. 7,909,603, and a continuation of application No. 11/032,977, filed on Jan. 11, 2005, now Pat. No. 7,267,545.

(51) **Int. Cl.**
*A61C 3/00*      (2006.01)

(52) **U.S. Cl.** ........................................ 433/10

(58) **Field of Classification Search** ................ 433/8–17
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,549,528 | A | 4/1951 | Russell |
| 3,772,787 | A | 11/1973 | Hanson |
| 4,248,588 | A | 2/1981 | Hanson |
| 4,492,573 | A | 1/1985 | Hanson |
| 4,559,012 | A | 12/1985 | Pletcher |
| 4,820,151 | A | 4/1989 | Pospisil |
| 4,927,362 | A | 5/1990 | Snead |
| 5,094,614 | A | 3/1992 | Wildman |
| 5,248,257 | A | 9/1993 | Cannon |
| 5,254,002 | A | 10/1993 | Reher et al. |
| 5,275,557 | A | 1/1994 | Damon |
| 5,322,435 | A | 6/1994 | Pletcher |

| | | | |
|---|---|---|---|
| 5,429,500 | A | 7/1995 | Damon |
| 5,439,378 | A | 8/1995 | Damon |
| 5,466,151 | A * | 11/1995 | Damon ........................ 433/10 |
| 5,474,445 | A | 12/1995 | Voudouris |
| 5,474,446 | A | 12/1995 | Wildman et al. |
| 5,562,444 | A | 10/1996 | Heiser et al. |
| 5,586,882 | A | 12/1996 | Hanson |
| 5,613,850 | A | 3/1997 | Wildman et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 623 320 A1 | 11/1994 |
| EP | 0691106 A1 | 1/1996 |

(Continued)

OTHER PUBLICATIONS

European Patent Office, Office Action in European Application No. 08012705.3-2318 dated Mar. 3, 2011.

(Continued)

*Primary Examiner* — Cris L Rodriguez
*Assistant Examiner* — Eric Rosen
(74) *Attorney, Agent, or Firm* — Wood, Herron & Evans, LLP

(57) **ABSTRACT**

An orthodontic bracket having a bracket body configured to be mounted to a tooth includes an archwire slot having a base surface defining a base plane and a slide engagement track defining a translation plane. The translation plane is angled with respect to the base plane. A ligating slide is engaged with the slide engagement track of the bracket body and movable along the slide engagement track and parallel to the translation plae between an opened position, in which an archwire is insertable into the archwire slot, and a closed position, in which the archwire is retained within the archwire slot. The translation plane is angled with respect to the base plane so as to prevent the ligating slide from contacting the gingiva surrounding the tooth when the ligating slide is moved to the opened position.

**26 Claims, 4 Drawing Sheets**



## US 8,393,896 B2
Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,630,715 | A | 5/1997 | Voudouris |
| 5,630,716 | A | 5/1997 | Hanson |
| 5,685,711 | A | 11/1997 | Hanson |
| 5,711,666 | A | 1/1998 | Hanson |
| 5,857,850 | A | 1/1999 | Voudouris |
| 5,906,486 | A | 5/1999 | Hanson |
| 5,908,293 | A | 6/1999 | Voudouris |
| 5,913,680 | A | 6/1999 | Voudouris |
| 6,071,118 | A | 6/2000 | Damon |
| 6,071,119 | A | 6/2000 | Christoff et al. |
| 6,142,775 | A | 11/2000 | Hansen et al. |
| 6,168,428 | B1 | 1/2001 | Voudouris |
| 6,193,508 | B1 | 2/2001 | Georgakis |
| 6,206,690 | B1 | 3/2001 | Vargas |
| 6,247,923 | B1 | 6/2001 | Vashi |
| 6,257,883 | B1 | 7/2001 | Voudouris |
| 6,358,045 | B1 | 3/2002 | Farzin-Nia et al. |
| 6,364,659 | B1 | 4/2002 | Lotte |
| 6,428,314 | B1 | 8/2002 | Jones, Jr. et al. |
| 6,485,299 | B1 | 11/2002 | Wildman |
| 6,506,049 | B2 | 1/2003 | Hanson |
| 6,607,383 | B2 | 8/2003 | Abels et al. |
| 6,616,445 | B2 | 9/2003 | Abels et al. |
| 6,655,957 | B2 | 12/2003 | Abels et al. |
| 6,655,958 | B2 | 12/2003 | Abels et al. |
| 6,659,766 | B2 | 12/2003 | Abels et al. |
| 6,659,767 | B2 | 12/2003 | Abels et al. |
| 6,695,612 | B2 | 2/2004 | Abels et al. |
| 6,709,268 | B2 | 3/2004 | Pospisil et al. |
| 6,733,286 | B2 | 5/2004 | Abels et al. |
| 6,776,613 | B2 | 8/2004 | Orikasa |
| 6,893,257 | B2 | 5/2005 | Kelly |
| 6,957,957 | B2 | 10/2005 | Pospisil |
| 7,267,545 | B2 | 9/2007 | Oda |
| 7,419,375 | B2 | 9/2008 | Farzin-Nia et al. |
| 7,909,603 | B2 * | 3/2011 | Oda .............................. 433/24 |
| 2001/0005574 | A1 | 6/2001 | Manemann et al. |
| 2002/0098460 | A1 | 7/2002 | Farzin-Nia et al. |
| 2002/0119414 | A1 | 8/2002 | Orikasa |
| 2004/0014005 | A1 * | 1/2004 | Kuhn ............................ 433/127 |
| 2004/0072117 | A1 | 4/2004 | Farzin-Nia et al. |

| | | | |
|---|---|---|---|
| 2004/0086826 | A1 | 5/2004 | Pospisil |
| 2004/0121279 | A1 | 6/2004 | Kelly |
| 2004/0166458 | A1 | 8/2004 | Opin et al. |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| GB | 687226 | A | 2/1953 |
| JP | 08168497 | A | 7/1996 |
| JP | 2003061980 | A | 3/2003 |
| WO | 2004/047665 | A1 | 6/2004 |
| WO | 2005/002461 | A1 | 1/2005 |

### OTHER PUBLICATIONS

European Patent Office, Partial European Search Report in Corresponding European Application No. EP 05 25 8116, dated Aug. 4, 2006 (11 pages).

Japanese Patent Office, Office Action in Japanese Patent Application No. JP2006-003007, mailed Mar. 17, 2009; 7 pages.

European Patent Office; Claudio Salvatore; European Search Report issued in corresponding European Application No. EP 10177158.2; Nov. 17, 2010; 6 pages.

European Patent Office; Claudio Salvatore; Partial European Search Report issued in corresponding European Application No. EP 08012705, dated Oct. 10, 2010; 8 pages.

U.S. Patent and Trademark Office, Office Action in U.S. Appl. No. 11/837,169, dated Dec. 29, 2008.

U.S. Patent and Trademark Office, Office Action in U.S. Appl. No. 11/837,169, dated Sep. 29, 2009.

U.S. Patent and Trademark Office, Office Action in U.S. Appl. No. 11/837,169, dated Apr. 16, 2010.

U.S. Patent and Trademark Office, Office Action in U.S. Appl. No. 11/837,169, dated Sep. 2, 2010.

U.S. Patent and Trademark Office, Office Action in U.S. Appl. No. 11/032,977, dated Sep. 22, 2006.

European Patent Office, Partial European Search Report in Corresponding European Application No. EP 05 25 8116, dated May 4, 2006 (4 pages).

Japanese Patent Office, Office Action in Japanese Patent Application No. JP2006-003007, mailed Oct. 6, 2009; 4 pages.

Japanese Patent Office, Office Action in Japanese Patent Application No. JP2006-003007, mailed May 6, 2010; 4 pages.

* cited by examiner



FIG. 1

FIG. 2

FIG. 3



FIG. 4A



FIG. 4B



FIG. 5A



FIG. 5B

US 8,393,896 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

**SELF-LIGATING ORTHODONTIC BRACKET**

CROSS-REFERENCE TO RELATED
APPLICATIONS

This application is a continuation of U.S. application Ser. No. 11/837,169 filed Aug. 10, 2007, which is a continuation of U.S. application Ser. No. 11/032,977 filed Jan. 11, 2005, now U.S. Pat. No. 7,267,545, the disclosures of which are incorporated by reference herein in their entireties.

FIELD OF THE INVENTION

The invention relates generally to orthodontic brackets and, more particularly, to self-ligating orthodontic brackets.

BACKGROUND OF THE INVENTION

Orthodontic brackets represent a principal component of all corrective orthodontic treatments devoted to improving a patient's occlusion. In conventional orthodontic treatments, an orthodontist or an assistant affixes brackets to the patient's teeth and engages an archwire into a slot of each bracket. The archwire applies corrective forces that coerce the teeth to move into correct positions. Traditional ligatures, such as small elastomeric O-rings or fine metal wires, are employed to retain the archwire within each bracket slot. Due to difficulties encountered in applying an individual ligature to each bracket, self-ligating orthodontic brackets have been developed that eliminate the need for ligatures by relying on a movable portion or member, such as a latch or slide, for captivating the archwire within the bracket slot.

Conventional orthodontic brackets for the first and second molar teeth typically include a bracket in the form of a buccal tube that provides an anchor for the archwire. The buccal tube is typically secured to a tooth or to a molar band, which is in turn cemented to the first or second molar teeth. A terminal end of a conventional archwire is then fitted into the tube to facilitate orthodontic treatment. In some orthodontic treatments, a severely rotated molar makes it difficult to insert the end of the archwire into both the first and second molar tubes. In these severely rotated cases, a convertible buccal tube is often used on the first molar tooth to overcome the difficulty encountered with conventional buccal tubes.

In some orthodontic treatments, however, it is undesirable to fix the archwire and prevent movement of the archwire, as is done when traditional ligatures secure the archwire to a convertible buccal tube. To overcome this limitation of current molar brackets, it would be desirable to use self-ligating brackets on the first and/or second molars. Nevertheless, their use has heretofore presented some undesirable drawbacks. For instance, one problem in using self-ligating brackets on the molar teeth is that their size often creates occlusion problems between the bracket and teeth on the opposing jaw. As the upper and lower teeth are brought together, such as for example, during chewing, the upper teeth may contact the brackets on the lower molars and may break or dislodge the brackets therefrom.

Furthermore, under normal conditions the gingival-occlusal height of molar teeth provides a limited surface on which to mount an orthodontic bracket. Prior self-ligating brackets have slides that engage the bracket body from below and travel along guides in the bracket body that are substantially parallel to the gingival-occlusal plane. Moreover, when in an opened position, the bottom edge of the slide extends below the bracket body. Thus, if traditional self-ligating brackets were attached to the bottom molar teeth, the bottom edge of the slide would contact gum tissue (gingival) causing patient discomfort. Moreover, because gingival interference with the slide would be significant, the slide could not be fully opened to accept an archwire thus defeating an advantage of self-ligating brackets.

Yet another problem often encountered with traditional direct bonded self-ligating brackets is with applying the brackets to teeth. To apply a self-ligating bracket to a tooth, a medical practitioner will use a tool, such as tweezers, to grasp the bracket and manipulate the bracket within the oral cavity. Traditional self-ligating brackets, however, typically do not provide convenient gripping points so that the medical practitioner may securely grasp the bracket. Consequently, it is difficult to manipulate the bracket within the oral cavity without the bracket disengaging from the tweezers and falling on the floor or in a patient's mouth. This problem would be exacerbated when attempting to apply self-ligating brackets to molar teeth at the rear of the oral cavity.

There is a need for a self-ligating orthodontic bracket attachable to molar teeth that overcomes these and other deficiencies of conventional self-ligating orthodontic brackets.

SUMMARY OF THE INVENTION

In one aspect of the invention, an orthodontic bracket includes a bracket body configured to be mounted to a tooth and includes an archwire slot having a base surface generally defining a base plane. The bracket body further includes a slide engagement track generally defining a translation plane. The translation plane is acutely angled with respect to the base plane. A ligating slide is engaged with the slide engagement track of the bracket body and movable along the slide engagement track and parallel to the translation plane between an opened position, in which an archwire is insertable into the archwire slot, and a closed position, in which the archwire is retained within the archwire slot. The translation plane may be angled between approximately 10 degrees and approximately 25 degrees, and preferably approximately 20 degrees, with respect to the base plane. The angled relation between the translation plane and the base plane is configured to prevent the ligating slide from contacting the gingiva surrounding the tooth when the ligating slide is moved to the opened position.

To provide a close fit between the archwire and the archwire slot, the ligating slide includes a surface confronting the slide engagement track having a first and second portion. The first portion engages the slide engagement track. The second portion covers the archwire slot when the ligating slide is in the closed position, and is angled with respect to the first portion so that the second portion is generally parallel to the base plane.

In another aspect of the invention, the bracket body includes a confronting side adapted to face teeth on an opposite jaw. The confronting side has a contoured shape such that as the jaws are closed and the upper and lower teeth are brought together, there is no occlusal interference between the orthodontic bracket and the teeth in the opposite jaw. The confronting side may include a recess adjacent an outer end that defines a generally planar surface which is substantially orthogonal to the base plane. The planar surface is adapted to provide a gripping point for an orthodontic tool, such as tweezers, used to apply the bracket to the tooth.

In yet another aspect of the invention, the movement of the ligating slide relative to the bracket body may be restricted so as to prevent the ligating slide from disengaging the bracket body. The bracket body may include one of a projecting

US 8,393,896 B2

3

portion or a receiving portion and the ligating slide may include the other of the projecting portion and the receiving portion, wherein the projecting portion or receiving portion moves relative to the other as the ligating slide moves along the slide engagement track between the opened and closed positions. The receiving portion includes a first end configured such that the projecting portion engages the first end when the ligating slide is in the opened position. In this way, the ligating slide is prevented from accidently or inadvertently disengaging from the bracket body.

In one embodiment, a retaining pin projects from the slide engagement track and the ligating slide includes a retaining slot extending through the ligating slide and oriented in a direction along which the ligating slide moves between the opened and closed positions. The retaining pin is received within the retaining slot and the retaining slot moves relative to the retaining pin as the ligating slide moves between the opened and closed positions. Another embodiment further shows the retaining pin associated with the ligating slide and a retaining groove associated with the bracket body that operates in a similar manner as described above. Other configurations are also possible for restricting the movement of the ligating slide relative to the bracket body. For instance, in other embodiments of the invention, the slide engagement track is bounded by at least one side wall having one of a projecting portion or a receiving portion and the ligating slide includes a peripheral edge that confronts the side wall. The peripheral edge includes the other of the projecting portion or the receiving portion. The projecting portion may be, for example, a retaining pin or a retaining ball and the receiving portion may be a retaining groove.

The above and other objects and advantages of the invention shall be made apparent from the accompanying drawings and the description thereof.

BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings, which are incorporated in and constitute a part of this specification, illustrate embodiments of the invention and, together with a general description of the invention given above, and the detailed description of the embodiments given below, serve to explain the principles of the invention.

FIG. 1 is a perspective view of a self-ligating orthodontic bracket according to the invention in which the ligating slide is removed from the assembly for clarity;

FIG. 2 is a perspective view of the self-ligating orthodontic bracket of FIG. 1 with the ligating slide in the closed position;

FIG. 3 is a cross-sectional view of the self-ligating orthodontic bracket of FIG. 2 generally taken along line 3-3;

FIG. 4A is a cross-sectional view of the self-ligating orthodontic bracket of FIG. 2 generally taken along line 4A-4A showing a retaining pin in the bracket body and a retaining slot through the ligating slide;

FIG. 4B is a cross-sectional view of an alternate embodiment of the self-ligating orthodontic bracket similar to FIG. 4A showing a retaining groove in the bracket body and a retaining pin in the ligating slide;

FIG. 5A is a perspective view of an alternate embodiment of the self-ligating orthodontic bracket showing a retaining ball in the bracket body and a retaining groove in the ligating slide; and

FIG. 5B is a broken away perspective view of an alternate embodiment of the self-ligating orthodontic bracket similar

4

to FIG. 5A showing a retaining groove in the bracket body and a retaining pin in the ligating slide.

DETAILED DESCRIPTION

Although the invention will be described next in connection with certain embodiments, the invention is not limited to practice in any one specific type of self-ligating orthodontic bracket. The description of the embodiments of the invention is intended to cover all alternatives, modifications, and equivalent arrangements as may be included within the spirit and scope of the invention as defined by the appended claims. In particular, those skilled in the art will recognize that the components of the embodiments of the invention described therein could be arranged in multiple different ways.

With reference to FIGS. 1 and 2, an orthodontic bracket, generally indicated by reference numeral 10, includes a bracket body 12 and a movable ligating slide 14 slidably coupled with the bracket body 12. The bracket body 12 includes an archwire slot 16 formed therein adapted to receive an archwire 18 (shown in phantom). The ligating slide 14 is moveable between an opened position in which the archwire 18 is insertable into the archwire slot 16 and a closed position in which the archwire 18 is retained within the archwire slot 16. The bracket body 12 and ligating slide 14 collectively form an orthodontic bracket 10 structure for use in corrective orthodontic treatments. The invention is advantageous for self-ligating brackets placed on the first and/or second molar teeth, although not so limited.

More particularly, the invention is advantageous for self-ligating brackets placed on the first and/or second molar teeth of the lower jaw. For this reason, the orthodontic bracket 10 of the invention is described herein using a reference frame attached to a molar tooth of the lower jaw. Consequently, and as used herein, terms such as labial, lingual, mesial, distal, occlusal, and gingival used to describe bracket 10 are relative to the chosen reference frame. The invention, however, is not limited to the chosen reference frame and descriptive terms, as the orthodontic bracket 10 of the invention may be used on other teeth and in other orientations within the oral cavity. By way of example, the orthodontic bracket 10 may be used on the molar teeth in the upper jaw and oriented so that the ligating slide 14 opens in either the occlusal or gingival direction. Those of ordinary skill in the art will recognize that the descriptive terms used herein may not directly apply when there is a change in reference frame. Nevertheless, the invention is intended to be independent of location and orientation within the oral cavity and the relative terms used to describe orthodontic bracket 10 are to merely provide an adequate description of the invention. As such, the relative terms labial, lingual, mesial, distal, occlusal, and gingival are in no way limiting the invention to a particular location or orientation.

The bracket body 12 has a lingual side 20, an occlusal side 22 when mounted to a tooth 23 carried by the patient's lower jaw, a gingival side 24, a mesial side 26, a distal side 28, and a labial side 30. The lingual side 20 of the bracket body 12 is configured to be secured to tooth 23 in any conventional manner, for example, by an appropriate orthodontic cement or adhesive or by a band around an adjacent tooth. The lingual side 20 may further be provided with a pad 32 that is secured to the outer surface of tooth 23.

In one advantageous aspect of the invention, the occlusal side 22 is profiled or contoured by including a labial portion 34 that projects generally in the gingival-labial direction. For instance, the occlusal side 22 may include a convex portion adjacent the lingual side 20 with a concave portion extending therefrom in the labial direction. In this way, the thickness of

US 8,393,896 B2

| 5 | 6 |

the bracket body **12** between the archwire slot **16** and occlusal side **22** is relatively thicker along the convex portion and thins or is reduced along the concave portion. Many traditional self-ligating brackets have an occlusal side that projects primarily in the labial direction. Consequently, when traditional self-ligating brackets are positioned on molar teeth, teeth on the opposing jaw often contact the occlusal side of the brackets when the teeth are brought together, such as for example during chewing. To avoid the undesirable contact of teeth with the orthodontic bracket, the self-ligating bracket **10** of the invention includes an occlusal side **22** with a labial portion **34** that projects in the gingival direction as well. This profiling moves the occlusal side **22** away from the teeth on the opposing jaw, shown schematically at **35**, so that as the teeth **23, 35** are brought together, the teeth **35** on the opposing jaw do not contact the occlusal side **22** of the orthodontic bracket **10**, thereby preventing occlusal interference (FIG. 3).

Occlusal side **22** may further include recess **36** in labial portion **34**. Recess **36** may be advantageously configured to include a generally planar surface **38** adapted to be a gripping point for a tool (not shown), such as tweezers, for manipulating the orthodontic bracket **120** within the oral cavity. As discussed below, planar surface **38** is generally orthogonal to the base plane defined by the base of the archwire slot **16**. This is particularly advantageous when attaching orthodontic brackets to molar teeth at the back of the oral cavity, where it can be difficult to manipulate the bracket **10** so as to properly attach the bracket **10** to the molar teeth **23**. Many traditional self-ligating brackets include occlusal sides that are irregular and thus are not conducive to gripping by an instrument such as tweezers. To aid the medical practitioner in applying the self-ligating bracket **10** of the invention, planar surface **38** is provided within recessed area **36**. Planar surface **38** provides an enhanced surface for securely gripping the orthodontic bracket **10** so that the medical practitioner may easily position the bracket **10** on the molar tooth **23**.

With continued reference to FIGS. 1 and 2, the bracket body **12** includes a base surface **40** and a pair of opposed slot surfaces **42, 44**, respectively, projecting labially from the base surface **40** that collectively define the archwire slot **16** extending in a mesial/distal direction from mesial side **26** to distal side **28**. The slot surfaces **42, 44** and base surface **40** are substantially encapsulated or embedded within the material of the bracket body **12**. The archwire slot **16** of the bracket body **12** is designed to receive the orthodontic archwire **18** in the same manner as typical prior art self-ligating orthodontic brackets.

The bracket body **12** further includes a generally planar support surface **46** projecting in a generally labial-gingival direction from slot surface **44**. Support surface **46** may include a pair of slide grooves **48, 50** extending in the occlusal-gingival direction at opposed mesial-distal ends of support surface **46**. A pair of opposed guides **52, 54** are carried by support surface **46** and are positioned on respective mesial and distal sides **26, 28** thereof. The guides **52, 54** are generally L-shaped each having a first leg projecting from support surface **46** in the labial direction. Guide **52** has a second leg projecting in the distal direction while guide **54** has a second leg projecting in the mesial direction so that collectively, guides **52, 54** partially overlie support surface **46**. Planar support surface **46** including grooves **48, 50** and guides **52, 54** collectively define a slide engagement track **56** for supporting and guiding ligating slide **14** within bracket body **12**.

In another advantageous aspect of the invention, the slide engagement track **56** and the archwire slot **16** generally have a non-orthogonal relationship. In particular, the base surface

**40** of the archwire slot **16** generally defines a base plane **58** and the slide engagement track **56** generally defines a translation plane **60** along which the ligating slide **14** moves between the opened and closed positions. It should be recognized that base surface **40** and slide engagement track **56** need not be precisely planar but configured such that base plane **58** and translation plane **60** may be generally defined. The base plane **58** and translation plane **60** are acutely angled with respect to each other by an angle A, as shown in FIG. 3. In this way, as the ligating slide **14** is moved from the closed position to the opened position along slide engagement track **56** and parallel to translation plane **60**, the ligating slide **14** moves generally in the labial-gingival direction so that the edge of the ligating slide **14** does not make contact with the gingiva **61** adjacent orthodontic bracket **10** when mounted to molar teeth **23**. To prevent the ligating slide **14** from contacting the gingiva **61**, the base plane **58** and translation plane **60** have an angle A between approximately 10 degrees and approximately 25 degrees, and preferably approximately 20 degrees. The invention, however, is not so limited and, as recognized by those of ordinary skill in the art, other angles suitable for a particular application are possible.

The ligating slide **14** is a generally planar structure comprising a mesial portion **64**, a distal portion **66**, and a central portion **68** intermediate the mesial portion **64** and the distal portion **66**. Mesial and distal portions **64** and **66** include integral slide rails **70, 72** extending in the occlusal-gingival direction and adapted to engage slide grooves **48, 50** of bracket body **12** when ligating slide **14** is engaged with bracket body **12**. Additionally, guides **52, 54** overlie mesial and distal portions **64, 66** respectively, and central portion **68** projects in the labial direction such that the labial surface of central portion **68** is substantially flush with the labial side **30** of the bracket body **12**. The labial surface of central portion **68** may include a channel **74** that tapers or narrows in the occlusal-gingiva direction and includes an aperture **76** located near the apex of channel **74**. As will be explained below, aperture **76** helps secure ligating slide **14** in the closed position.

A resilient engagement member **78** operates to secure the ligating slide **14** in the closed position. The resilient engagement member **78** is generally L-shaped and includes a lingually-extending prong **80** that is received in a recess **82** formed in support surface **46**. The free end of the resilient engagement member **78** is provided with an labially-extending detent or projection **84**, which corresponds generally in cross section with the cross section of aperture **76** in ligating slide **14**. The projection **84** extends into aperture **76** in ligating slide **14** when ligating slide **14** is in the closed position. The engagement between the projection **84** and the aperture **76** holds the ligating slide **14** in the closed position against movement that would otherwise open the slide **14**. As a result, ligating slide **14** is unlikely to be unintentionally moved from the closed position to the opened position.

The free end of resilient engagement member **78** carrying projection **84** is elastically compressed when ligating slide **14** is in an opened position and projection **84** engages the lingual surface of ligating slide **14**. Consequently, the free end of resilient engagement member **78** is capable of resiliently flexing or deforming in the labial direction and toward ligating slide **14** when the projection **84** is aligned with aperture **76**, for selectively engaging the projection **84** with the aperture **76** so as to lock the ligating slide **14** in the closed position. To that end, resilient engagement member **78** is biased in the labial direction to force projection **84** away from the tooth **23** and toward ligating slide **14**.

US 8,393,896 B2

7

In another advantageous aspect of the invention, it is desirable to provide an archwire slot 16 that provides a close fit with the archwire 18 being inserted therein. Thus as shown in FIGS. 3, 4A and 4B, the archwire slot 16 typically has a generally rectangular configuration. The mutual arrangement of the base surface 40 and the side slot surfaces 42, 44 is generally rectangular and provides a close fit to a generally rectangular archwire 18. Nevertheless, because the base plane 58 of the archwire slot 16 and the translation plane 60 along which ligating slide 14 travels are angled with respect to each other, the ligating slide 14 has to be modified in order to provide a close fit to the labial surface of archwire 18. To this end, the lingual surface of slide rails 70, 72 includes a first and second portion 86, 88 respectively. First portion 86 engages the slide grooves 48, 50 of slide engagement track 56. The second portion 88 is angled with respect to first portion 86 such that second portion 88 is generally parallel to base plane 58. Second portion 88 covers the archwire slot 16 when ligating slide 14 is in the closed position. The second portion 88 is angled by an amount substantially equal to the angle A between the base plane 58 and translation plane 60. In this way, ligating slide 14 provides a close fit to the labial surface of archwire 18.

In yet another advantageous aspect of the invention, the labial portion 34 of occlusal side 22 extends in the labial direction beyond the archwire slot 16 to define a ledge, generally shown at 90, extending in the mesial-distal direction. Ledge 90 includes a labial surface 92 that is generally parallel to base plane 58. When the ligating slide 14 is moved to the closed position, the occlusal end of the second portion 88 on slide rails 70, 72 abuts the labial surface 92 of ledge 90 and is covered by labial portion 34 of occlusal side 22. In this way, food or other material in the oral cavity is prevented from contacting the occlusal edge of ligating slide 14 and inadvertently dislodging slide 14 to the opened position. Furthermore, labial portion 34 provides a stop so as to prevent ligating slide 14 from overshooting the closed position as the ligating slide is being moved from the open position to the closed position.

To regulate the movement of ligating slide 14 relative to bracket body 12, the bracket body 12 may include one of a projecting portion or a receiving portion, and ligating slide 14 may include the other of the projecting portion of the receiving portion. The projecting portion and receiving portion cooperate to regulate the movement of ligating slide 14. For example, as shown in FIG. 4A, ligating slide 14 includes a retaining slot 94 (FIG. 1) through ligating slide 14 and extending generally in the occlusal-gingival direction. Retaining slot 94 may be formed in the distal portion 66 of ligating slide 14, as shown in FIGS. 1 and 2, but may also be formed in the mesial portion 64. A retaining pin 96 includes a lingual portion received within a recess 98 formed in support surface 46 that aligns with the slot 94 in ligating slide 14. The retaining pin 96 projects in the labial direction and is received in slot 94 so that as the ligating slide 14 moves between opened and closed positions, retaining slot 94 moves relative to retaining pin 96, as shown in FIG. 2. The retaining pin/slot configuration prevents accidental or unintentional detachment of the ligating slide 14 from the bracket body 12 during use when the ligating slide 14 is positioned in the opened position. It should be realized that the retaining pin/slot configuration does not lock the ligating slide 14 in any position, as does engagement member 78, but regulates the movement of the ligating slide 14 in the occlusal-gingival direction.

Additionally, the length of retaining slot 94 limits the occlusal-gingival range of movement of ligating slide 14. The retaining slot 94 may be configured lengthwise so that in the fully opened position, the archwire 18 may be inserted into

8

archwire slot 16. For instance, the retaining pin 96 may abut a first slot end 100 when the occlusal edge of ligating slide 14 is approximately flush with archwire slot surface 44. In this way, the archwire 18 may be easily inserted into the archwire slot 16. A second slot end 102 may be configured so that the projection 84 of resilient engagement member 78 is permitted to align with aperture 76 in ligating slide 14 so as to lock the ligating slide 14 in the closed position. Retaining pin 96 may abut second slot end 102 when ligating slide 14 is in the closed position.

An alternate embodiment of the self-ligating orthodontic bracket 10 is shown in FIG. 4B, in which like reference numerals refer to like features in FIG. 4A. In this embodiment, the receiving portion is included on the bracket body 12 and the projecting portion is included on the ligating slide 14. In particular, bracket body 12 includes a retaining groove 104 in the support surface 46 extending generally in the occlusal-gingival direction. The retaining groove 104 may be formed in support surface 46 adjacent the distal side 28 of bracket body 12, but may also be formed adjacent the mesial side 26. A retaining pin 106 includes a labial portion received within a recess 108 in ligating slide 14 that aligns with retaining groove 104 in bracket body 12. The retaining pin 106 projects in the lingual direction and is received in retaining groove 104 so that as the ligating slide 14 moves between opened and closed positions, retaining pin 106 moves relative to retaining groove 104. In operation, the retaining pin/slot configuration shown in FIG. 4B functions in substantially the same manner as the retaining pin/slot configuration shown and described above for FIG. 4A.

In FIGS. 5A and 5B, in which like reference numerals refer to like features in FIGS. 1-4A, the projecting portion and receiving portion have an alternate configuration and/or location for regulating the movement of ligating slide 14 relative to bracket body 12. For example, in the embodiment shown in FIG. 5A, one of the guides, such as guide 52, of bracket body 12 includes an aperture 110 in the mesial side 26 which extends therethrough. A retaining ball 112 is pressed into aperture 110 with an interference fit so that a portion of retaining ball 112 extends into the space between guide 52 and support surface 46. The mesial surface of rail 70 includes a retaining groove 114 (shown in phantom) extending generally in the occlusal-gingival direction and defining a first end and second end 116, 118, respectively. The retaining ball 112 projects in the distal direction and is received in retaining groove 114 so that as ligating slide 14 moves between the opened and closed positions, retaining groove 114 moves relative to retaining ball 112. Those of ordinary skill in the art will recognize that the retaining ball 112 and corresponding retaining groove 114 may also be located in the distal side 28 of bracket body 12 and ligating slide 14.

The retaining ball/groove configuration prevents accidental or unintentional detachment of the ligating slide 14 from bracket body 12 during use when the ligating slide 14 is positioned in the open position and functions in substantially the same manner as the retaining pin/slot configuration shown and described above for FIG. 4A. For instance, the length of retaining groove 114 limits the occlusal-gingival range of movement of ligating slide 14. The retaining groove 114 is configured so that in the fully open position, the archwire 18 may be inserted into archwire slot 16. The retaining ball 112 may abut first groove end 116 when the occlusal end of the ligating slide 14 is approximately flush with archwire slot surface 44. In this way, the archwire 18 may be easily inserted into the archwire slot 16. Furthermore, the second groove end 118 is configured so that the projection 84 of resilient engagement member 78 may be permitted to align with aperture 76

9         10

in ligating slide 14 so as to lock the ligating slide 14 in the closed position. Retaining ball 112 may abut second groove end 118 when ligating slide 14 is in the closed position.

Although the embodiment shown in FIG. 5A shows the projecting portion associated with the bracket body 12 and the receiving portion associated with the ligating slide 14, the invention is not so limited as the receiving portion may be associated with the bracket body 12 and the projecting portion may be associated with the ligating slide 14. In the alternate embodiment of the self-ligating orthodontic bracket 10 shown in FIG. 5B, bracket body 12 includes a retaining groove 120 in the distal surface of guide 52 extending generally in the occlusal-gingival direction and defining first and second groove ends 122, 124, respectively. A retaining pin 126 includes a distal portion received within a recess 128 in ligating slide 14 that aligns with retaining groove 120 in guide 52. The retaining pin 126 projects in the mesial direction and is received in retaining groove 120 so that as the ligating slide 14 moves between opened and closed positions, retaining pin 126 moves relative to retaining groove 120. In operation, the retaining pin/slot configuration shown in FIG. 5B functions in substantially the same manner as the retaining ball/groove configuration shown and described above for FIG. 5A.

In these embodiments, the bracket body 12 may be made by any suitable forming technique, such as metal injection molding (MIM), from a biocompatible metal, such as a stainless steel and, more specifically, a 17-4 stainless steel. The resilient engagement member 78 may be made from any suitable material, including stainless steels, titanium alloys and Ni/Ti type superelastic materials. The ligating slide 14 may be formed by any suitable process, such as MIM, from any biocompatible material, including metals such as stainless steel.

With reference to FIG. 2, the ligating slide 14 in the closed position blocks the entrance to the archwire slot 16 to capture the archwire 18 therein and the engagement between projection 84 and aperture 76 provides a latched condition. The ligating slide 14 may be unlocked using an end of a tool (not shown) designed to press the projection 84 inwardly (i.e., lingually) toward the tooth 23 with a force sufficient to overcome the bias applied by resilient member 78 and disengage the projection 84 from the aperture 76 in the ligating slide 14 to provide an unlatched condition. When the projection 84 is moved by the tool inwardly (i.e., lingually) by a distance adequate to substantially clear the plane of the lingual surface of the ligating slide 14, the ligating slide 14 is freely movable using a force applied by the tool occlusal-gingivally toward the opened position in a slideable manner and guided by guides 52, 54. The motion of the ligating slide 14 may be positively stopped in the opened position by contact between the retaining pin 96 and the first slot end 100 of retaining slot 94.

To place the ligating slide 14 in the closed position, slide 14 is moved occlusal-gingivally until the projection 84 springs outwardly under the bias applied by resilient member 78 and is received in the aperture 76. The ligating slide 14 is then securely locked in the closed position. The engagement of the projection 84 into the aperture 76 may create a tactile effect which is perceptible to a clinician and/or emits an audible sound, such as a click, that is likewise perceptible by a clinician. The alternate embodiments shown in FIGS. 4B, 5A and 5B may be operated in a similar manner.

The self-ligating bracket of the invention provides a number of advantages over traditional molar brackets, such as buccal tubes or convertible buccal tubes. In particular, the self-ligating bracket may be used in severely rotated cases without constraining the movement of the archwire. Traditional self-ligating brackets, however, have some problems when applied to molar teeth. The self-ligating bracket of the invention overcomes these limitations. In particular, self-ligating bracket of the invention provides a slide engagement track for the ligating slide that is angled so that the edge of the ligating slide does not contact the gingiva surrounding a molar tooth when the slide is opened. The bracket also provides a contoured-shaped surface that prevents occlusal interference with teeth on the opposite jaw. The bracket further provides a mechanism for regulating the movement of the ligating slide so as to prevent the ligating slide from disengaging from the bracket body.

While the invention has been illustrated by a description of various embodiments and while these embodiments have been described in considerable detail, it is not the intention of the applicant to restrict or in any way limit the scope of the appended claims to such detail. Additional advantages and modifications will readily appear to those skilled in the art. For example, as shown in the figures, the self-ligating orthodontic bracket 10 may include mesial and/or distal hooks that aid in the orthodontic treatment of teeth. The invention in its broader aspects is therefore not limited to the specific details, representative apparatus and methods, and illustrative examples shown and described. Accordingly, departures may be made from such details without departing from the spirit and scope of applicant's inventive concept.

What is claimed is:

1. A self-ligating orthodontic bracket for coupling an archwire with a tooth, comprising:

  a bracket body configured to be mounted to the tooth, the bracket body including a support surface, a ledge, and an archwire slot including a base surface and opposing first and second slot surfaces extending from the base surface, the base surface being interposed between the opposing first and second slot surfaces, the support surface being acutely angled with respect to the base surface, and the ledge opposing the support surface across the archwire slot and including a surface that is generally parallel to the base surface; and

  a movable member coupled with the bracket body and movable between an opened position in which the archwire is insertable into the archwire slot and a closed position in which the movable member retains the archwire in the archwire slot,

    wherein the movable member comprises a first portion and a second portion extending at an acute angle from the first portion, the first portion engaging the acutely angled support surface of the bracket body when the movable member is in the closed position, the second portion being generally parallel to the base surface and extending across the archwire slot from the first slot surface to the second slot surface when the movable member is in the closed position.

2. The self-ligating orthodontic bracket of claim 1, wherein the ledge extends in the mesial-distal direction, the second portion of the movable member cooperating with the ledge when the movable member is in the closed position.

3. The self-ligating orthodontic bracket of claim 1, wherein the support surface is angled between approximately 10 degrees and 25 degrees with respect to the base surface.

4. The self-ligating orthodontic bracket of claim 1, wherein the support surface is angled approximately 20 degrees with respect to the base surface.

5. The self-ligating orthodontic bracket of claim 1, wherein the acute angle between the first portion and the second portion of the movable member is maintained during movement between the opened position and the closed position.

US 8,393,896 B2

11                                          12

6. The self-ligating orthodontic bracket of claim 1, wherein the support surface intersects one of the opposing first and second slot surfaces to define an edge of the archwire slot and the support surface defines a translation plane that intersects the other of the opposing first and second slot surfaces.

7. The self-ligating orthodontic bracket of claim 1, wherein the second portion of the movable member abuts the surface of the ledge that is generally parallel to the base surface when the movable member is in the closed position.

8. The self-ligating orthodontic bracket of claim 1, wherein a portion of the bracket body that includes the ledge extends beyond the movable member and is configured to prevent food or other material from inadvertently dislodging the member from the closed position.

9. The self-ligating orthodontic bracket of claim 1, wherein a portion of the bracket body that includes the ledge provides a stop to prevent the movable member from overshooting the closed position as the movable member is being moved from the opened position to the closed position.

10. A self-ligating orthodontic bracket for coupling an archwire with a tooth, comprising:
   a bracket body configured to be mounted to the tooth, the bracket body including an archwire slot including a base surface and opposing first and second slot surfaces extending from the base surface, the base surface being interposed between the opposing first and second slot surfaces, a support surface being acutely angled with respect to the base surface, and a ledge opposing the support surface across the archwire slot and including a surface that is generally parallel to the base surface;
   a movable member coupled with the bracket body and slidable from a closed position in which the movable member retains the archwire in the archwire slot toward an opened position in which the archwire is insertable into the archwire slot, the movable member comprising a first portion and a second portion extending at an acute angle from the first portion,
   wherein the first portion engages the support surface in the closed position and the second portion is generally parallel to the base surface during sliding movement of the movable member from the closed position toward the opened position.

11. The self-ligating orthodontic bracket of claim 10, wherein the movable member further includes an occlusal-gingival extending groove defining at least one end that limits movement of the movable member in at least one direction.

12. The self-ligating orthodontic bracket of claim 11, wherein the first portion defines a plane and the at least one end of the groove defines a projection that defines the end and lies in the plane of the first portion.

13. The self-ligating orthodontic bracket of claim 12, wherein the projection abuts the bracket body when the movable member is in the closed position.

14. The self-ligating orthodontic bracket of claim 10, wherein the second portion extends from the first slot surface to the second slot surface in a direction generally transverse to the archwire slot to cover the archwire slot when the movable member is in the closed position.

15. The self-ligating orthodontic bracket of claim 10, wherein the acute angle between the first portion and the second portion of the movable member is maintained during movement between the opened position and the closed position.

16. The self-ligating orthodontic bracket of claim 10, wherein the support surface intersects one of the opposing first and second slot surfaces to define an edge of the archwire slot and the support surface defines a translation plane that intersects the other of the opposing first and second slot surfaces.

17. A method of using an orthodontic bracket mounted to a tooth surrounded by gingiva, the orthodontic bracket including a bracket body having an archwire slot with a base surface generally defining a base plane, a generally planar support surface acutely angled relative to the base surface, and a ledge opposing the base surface across the archwire slot and including a surface that is generally parallel to the base surface, and a ligating member movably mounted to the bracket body and including a first portion engaging the acutely angled support surface of the bracket body and a second portion extending at an acute angle from the first portion and being generally parallel with the base surface, the method comprising:
   moving the ligating member relative to the base plane to an opened position, the archwire slot being accessible when the ligating member is in the opened position and the second portion being generally parallel to the base surface during sliding movement of the ligating member from the closed position toward the opened position;
   inserting an archwire into the archwire slot; and
   moving the ligating member relative to the base plane to a closed position such that the ligating member engages the acutely angled support surface in the closed position, the archwire being retained in the archwire slot when the ligating member is in the closed position.

18. The method of claim 17, further comprising:
   securing the ligating member relative to the bracket body when the ligating member is in the closed position, and
   after securing, releasing the ligating member to move the ligating member to the opened position.

19. The method of claim 17, further comprising:
   limiting occlusal-gingival movement of the ligating member relative to the bracket body so as to prevent the ligating member from disengaging from the bracket body when the ligating member is moved from the closed position.

20. The method of claim 19, wherein limiting occlusal-gingival movement of the ligating member further comprises:
   engaging a projecting portion in one of the bracket body or the ligating member with a receiving portion in the other of the bracket body or the ligating member, the receiving portion having at least one end that stops movement of the projecting portion in one direction.

21. The method of claim 20, wherein the projecting portion includes a retaining pin projecting from the bracket body and the receiving portion includes a retaining slot in the ligating member.

22. The method of claim 20, wherein the projecting portion includes a retaining ball projecting from the bracket body and the receiving portion includes a retaining groove in the ligating member.

23. The method of claim 17, wherein moving the ligating member toward the closed position further comprises:
   sliding the first portion in contact with the acutely angled support surface while the second portion remains generally parallel to the base surface during sliding of the ligating member toward the closed position.

24. The method of claim 17, wherein the ligating member further includes an occlusal-gingival extending groove defining at least one end, and wherein moving the ligating member includes limiting occlusal-gingival movement of the ligating member with the end.

25. The method of claim 24, wherein the first portion defines a plane and the at least one end of the groove defines a projection that lies in the plane of the first portion, and

A069

US 8,393,896 B2

13

wherein regulating occlusal-gingival movement of the ligating member includes sliding the projection into an abutting position against the bracket body when the ligating member is slid to the closed position.

**26.** A method of using an orthodontic bracket mounted to a tooth surrounded by gingiva, the orthodontic bracket including a bracket body having an archwire slot with a base surface generally defining a base plane, a generally planar support surface acutely angled relative to the base surface, and a ledge opposing the base surface across the archwire slot and including a surface that is generally parallel to the base surface, and a ligating member movably mounted to the bracket body, wherein the ligating member comprises a first portion and a second portion extending at an acute angle from the first portion, the first portion engaging the acutely angled support surface of the bracket body, the method comprising:

14

sliding the ligating member relative to the base plane toward an opened position, the archwire slot being accessible when the ligating member is in the opened position;

inserting an archwire into the archwire slot; and

sliding the ligating member relative to the base plane toward a closed position, the archwire being retained in the archwire slot when the ligating member is in the closed position, wherein, during sliding of the ligating member, the first portion is in contact with the acutely angled support surface while the second portion remains generally parallel to the base surface.

* * * * *

## CERTIFICATE OF SERVICE

I hereby certify that copies of the foregoing **BRIEF FOR ORMCO**

**CORPORATION** were served upon registered counsel by operation of the

Court's CM/ECF system on this 12th day of February, 2014.

Peter D. Hawkes
LANE POWELL PC
601 SW Second Avenue, Suite 2100
Portland, OR 97204-3158
hawkesp@lanepowell.com

**/s/Donna Stockton**
Donna Stockton